[L.A. No. 31142. Mar. 27, 1980.]

LESTER E. OLSON et al., Plaintiffs and Respondents, v.
KENNETH CORY, as State Controller, et al., Defendants
and Appellants.

536

**COUNSEL**

Howard, Prim, Rice, Nemerovski, Canady & Pollak, Jerome B. Falk, Jr., Ann Brick, John H. Larson, County Counsel, William F. Stewart and Halvor S. Melom for Defendants and Appellants.

William H. Levit, Stroock & Stroock & Lavan, Henry J. Silberberg, Margaret A. Nagle, Gibson, Dunn & Crutcher, Richard Chernick, Wayne W. Smith and Daniel Q. Callister for Plaintiffs and Respondents.

Edwin A. Heafey, Jr., Peter W. Davis, Crosby, Heafey, Roach & May, Robert A. Seligson, Cotchett, Dyer & Illston, Joseph W. Cotchett, Susan Illston, Robert C. Danneskiold, J. Anthony Kline, Byron S. Georgiou and Allen H. Sumner as Amici Curiae.

**OPINION**

**CLARK, J.**—Defendants, Controller of the State of California and Auditor-Controller of the County of Los Angeles, appeal from judgment declaring unconstitutional 1976 legislation purporting to place a limit on cost-of-living increases previously provided for judicial salaries.[1] The statute as amended was held unconstitutional by the superior court on grounds it constitutes an impermissible impairment of vested

---

[1] Prior to amendment in 1976 Government Code section 68203 provided in pertinent part: "...on September 1 of each year...the salary of each justice and judge...shall be increased by that amount which is produced by multiplying the then current salary of each justice or judge by the percentage by which the figure representing the California consumer price index as compiled and reported by the California Department of Industrial Relations has increased in the previous calendar year." (Stats. 1969, ch. 1507, § 1.)

Section 68203, effective 1 January 1977, provides in pertinent part: "On July 1, 1978, and on July 1 of each year thereafter the salary of each justice and judge...shall be increased by that amount which is produced by multiplying the then current salary of each justice or judge...by the percentage by which the figure representing the California consumer price index as compiled and reported by the California Department of Industrial Relations has increased in the previous calendar year, but not to exceed five percent (5%)." (Stats. 1976, ch. 1183, § 4.)

contractual rights (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9) and conflicts with California Constitution, article III, section 4.[2]

Defendants contend that placing a limit on current provisions providing for cost-of-living increases to judicial salaries does not impair the vested or contractual rights of judges in office or of judicial pensioners. Additionally, defendants contend that the amendment to section 68203 does not reduce judicial salaries in violation of Proposition 6. We reject defendants' contentions and affirm in part the judgment of the superior court.

In amending section 68203 the Legislature attempted in effect first to maintain judicial salaries at the 1 September 1976 level for 22 months, and then to limit prospective increases beginning on 1 July 1978 to 5 percent regardless of the actual increase in the California Consumer Price Index (hereinafter CPI). (See fn. 1, *ante.*) Without the amendment judges would have been entitled to a 5.327 percent increase beginning on 1 September 1977. After the defendant Controller announced he would not pay such an increase, plaintiffs—judges in office and judicial pensioners—commenced this action for declaratory relief.

### CONFLICT OF INTEREST

■ We consider first whether we may hear and adjudicate the cause, recognizing each member of this court is financially interested in the outcome. The rule of necessity provides that a judge is not disqualified from adjudicating a cause because of personal financial interest if there is no other judge or court available to hear and resolve the cause. (See *Atkins* v. *United States* (1977) 556 F.2d 1028 [214 Ct.Cl. 118].) It is immediately apparent that all California judges have at least an involuntary financial interest in this case. To disqualify one would disqualify all, depriving them and their surviving spouses of opportunity to litigate their case. This court as now constituted is qualified to hear and determine the issues before us.

### ABRIDGMENT OF VESTED OR CONTRACTUAL RIGHTS OF JUDGES IN OFFICE

■ We recognize the often quoted language that public employment is not held by contract and therefore is not protected by the contract clause. (*Markman* v. *County of Los Angeles* (1973) 35 Cal.App.3d 132,

---

[2]That section provides: "Salaries of elected state officers may not be reduced during their term of office. Laws that set these salaries are appropriations." The section was added to the Constitution in 1972 as a part of an initiative measure designated Proposi-

134-135 [110 Cal.Rptr. 610]; see also *Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 150 [82 P.2d 434, 126 A.L.R. 838].) Those and other cases involve purported rights to remain in office or to continued public employment. On the other hand, we deal here with the right to compensation by persons serving their term of public office to which they have undisputed rights. "[P]ublic employment gives rise to certain obligations which are protected by the contract clause of the Constitution. . . ." (*Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 852-853 [179 P.2d 799]; see also *California League of City Employee Associations* v. *Palos Verdes Library Dist.* (1978) 87 Cal.App.3d 135, 139 [150 Cal.Rptr. 739].) Promised compensation is one such protected right. (*Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 308-309 [152 Cal.Rptr. 903, 591 P.2d 1].) Once vested, the right to compensation cannot be eliminated without unconstitutionally impairing the contract obligation. (*Id.,* at p. 314.) When agreements of employment between the state and public employees have been adopted by governing bodies, such agreements are binding and constitutionally protected. (*Sonoma County Organization of Public Employees* v. *County of Sonoma, supra,* 23 Cal.3d 296, 304, quoting from *Glendale City Employees Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 337-338 [124 Cal.Rptr. 513, 540 P.2d 609].) In the instant case the Legislature in 1969 adopted the full cost-of-living increase provision, binding the state to pay persons employed at the represented compensation for their terms of office.

Prior to the 1976 amendment judges had a vested right not only to their office for a certain term but also to an annual increase in salary equal to the full increase in the CPI during the prior calendar year. ██ ██ With the 1976 amendment the state purported to withdraw that right unilaterally thus impairing a vested interest.[3]

---

tion No. 6. It is hereinafter referred to as Proposition 6.

Also pertinent to the issues herein is California Constitution, article VI, section 19: "The Legislature shall prescribe compensation for judges of courts of record."

[3]We are not persuaded by dicta extracted from *Millholen* v. *Riley* (1930) 211 Cal. 29 [293 P. 69], claimed to suggest that the relationship between judges and the state is not contractual in nature. In the first place, the employment relationship there involved a law secretary whose duties were deemed to be in "the nature of a public office" which apparently could be terminated at will. (*Id.,* at p. 33.) The issue was not one of a vested contractual right but rather the constitutional power of a court to employ and provide compensation for necessary personnel independently of statutory provisions deemed to concern only the executive department of state. Moreover, although the elements of a public office—an office created by law rather than by an express contract of employment—may be different in some respects (see 1 Witkin, Summary of Cal. Law (8th ed. 1973) p. 647), it does not follow that no contractual relationship exists between the

The question remaining is whether in the circumstances of this case the impairment is in some way permissible.

In *Sonoma County Organization of Public Employees* v. *County of Sonoma, supra*, 23 Cal.3d 296 this court reiterated the four factors identified by the United States Supreme Court in *Home Building and Loan Assn.* v. *Blaisdell* (1934) 290 U.S. 398 [78 L.Ed. 413, 54 S.Ct. 231, 88 A.L.R. 1481] warranting legislative impairment of vested contract rights. Those factors are: (1) the enactment serves to protect basic interests of society, (2) there is an emergency justification for the enactment, (3) the enactment is appropriate for the emergency, and (4) the enactment is designed as a temporary measure, during which time the vested contract rights are not lost but merely deferred for a brief period, interest running during the temporary deferment. (23 Cal.3d at pp. 305-306.)

In applying these standards the enactment's severity must be measured to determine "the height of the hurdle the state legislation must clear." (*Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234 [57 L.Ed.2d 727, 98 S.Ct. 2716].) This court stated in *Sonoma County* that impairing a granted increase in wages goes to the heart of the employment contract and is therefore severe and permanent. (*Sonoma County Organization of Public Employees* v. *County of Sonoma, supra*, 23 Cal.3d 296, 308-309.) Therefore the state's hurdle in applying the four factors in the instant case is heightened because section 68203 is an impairment affecting the heart of the employment contract.

Defendants, offering no reason or justification for the state action, fail even to approach their burden of demonstrating the impairment of plaintiffs' rights is warranted by an "emergency" serving to protect a "basic interest of society."

A judge entering office is deemed to do so in consideration of—at least in part—salary benefits then offered by the state for that office. If salary benefits are diminished by the Legislature during a judge's term, or during the unexpired term of a predecessor judge (see Cal. Const., art. VI, § 16; Gov. Code, §§ 71145, 71180), the judge is nevertheless entitled to the contracted-for benefits during the remainder of such term. The right to such benefit accrues to a judge who served *during* the period beginning 1 January 1970 to 1 January 1977,

state and a person elected or appointed to that office. In fact, the elements of compensation for such an office become contractually vested upon acceptance of employment. (See *Betts* v. *Board of Administration* (1978) 21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614].)

whether his term of office commenced prior to or during that time period. ■ "An employee's contractual pension expectations are measured by benefits which are in effect not only when employment commences, but which are thereafter conferred during the employee's subsequent tenure." (*Betts* v. *Board of Administration, supra*, 21 Cal.3d 859, 866.)[4]

■ A judge who completes one term during which he was entitled to unlimited cost-of-living increases and elects to enter a new term has impliedly agreed to be bound by salary benefits then offered by the state for the different term. Thus, while a judge is entitled to a salary based on unmodified Government Code section 68203 throughout a term ending, for instance, in 1978, his salary for a new term beginning on or after the effective date of the 1976 amendment—1 January 1977—will be governed by the statute as amended. Likewise, a judge entering office for the first time on or after 1 January 1977, including a judge entering upon his own term or upon the unexpired term of a predecessor judge, cannot claim any benefit based on section 68203 before the 1976 amendment.

As will be seen, our conclusions based on the contract clause as affecting salaries of judges in office are consistent with our conclusions regarding Proposition 6.

### ABRIDGEMENT OF VESTED OR CONTRACTUAL RIGHTS OF JUDICIAL PENSIONERS

The 1976 amendment, in addition to impairing the vested rights of judges in office, also impairs those of judicial pensioners.[5] ■ A long line of this court's decisions has reiterated the principle that a public employee's pension rights are an integral element of compensation and a vested contractual right accruing upon acceptance of employment. (*Betts* v. *Board of Administration, supra*, 21 Cal.3d 859, 863; *Kern* v.

---

[4]While *Betts* deals with questions of a pensioner's—as distinguished from an employed person's—contractual benefits, it is clear a pensioner's contractual benefits are merely derivative from covenants of employment. Moreover, as will be seen in our discussion of Proposition 6, that constitutional provision forecloses *any* salary reduction during a judge's term in office, including reduction in a cost-of-living provision enacted during the same term in office.

[5]As used herein, the phrase "judicial pensioners" refers to both retired judges and other persons whose benefits are based on services of a deceased judge, e.g., the surviving spouse or minor children of a deceased or retired judge.

*City of Long Beach, supra,* 29 Cal.2d 848, 852-853.) In *Betts,* this court held that a former state treasurer who had served in that office from 1959 to 1967 was entitled to a pension on the basis of the law in effect at the time of his termination rather than the modified law in effect at the time of his application for pension benefits in 1976. (*Id.,* at pp. 867-868.) The statute in effect in 1976 purported to withdraw benefits to which he had earned a vested contractual right while employed. Although an employee does not obtain any "absolute right to fixed or specific benefits...there [are] strict limitation[s] on the conditions which may modify the pension system in effect during employment." (*Betts v. Board of Administration, supra,* 21 Cal.3d 859, 863-864.) Such modifications must be reasonable and any "'changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.'" (*Id.,* at p. 864.) Since no new comparable or offsetting benefit appeared in the modified plan, we held the 1976 statute unconstitutionally impaired the pensioner's vested rights.

In the present case the state has purported to modify pension rights with the amendment of section 68203. Between 31 December 1969 and 1 January 1977, a judicial pensioner was entitled to receive benefits based on a specified percentage of the salary of a judge holding the judicial office to which the retired or deceased judge was last elected or appointed. (Gov. Code, § 75000 et seq.) The salary for such a judicial office—if the retired or deceased judge served in office during the period 1970 to 1977—was convenanted to increase annually with the increase in the CPI. The 1976 limitation on increases in judicial salaries is, in turn, calculated to diminish benefits otherwise available to those judicial pensioners. Such modification of pension benefits works to the disadvantage of judicial pensioners by reducing potential pension increases, and provides no comparable new benefit. Again, we conclude that defendants have failed to demonstrate justification for impairing these rights or that comparable new advantages were included and that section 68203 as amended is unconstitutional as to certain judicial pensioners.

Contractually, each judicial pensioner is entitled to some fixed percentage of the salary payable to the judge holding the particular judicial office to which the retired or deceased judge was last elected or appointed. (See e.g., Gov. Code, §§ 75032, 75033.5, 75060.6, 75076, 75077, 75091, 75093, 75094, 75096, 75096.1, 75096.3.) Accordingly, a judicial pensioner cannot claim impairment of a *vested* right arising out

of the 1976 amendment except when the judge holding the particular judicial office could also claim such an impairment. The resolution of pensioner vested rights, then, is dependent on the foregoing resolution of judges' vested rights left unimpaired by the 1976 amendment.

Judicial pensioners whose benefits are based on judicial services terminating while section 68203 provided for unlimited cost-of-living increases in judicial salaries, acquired a *vested* right to a pension benefit based on some proportionate share of the salary of the judge or justice occupying the particular judicial office including the incumbent judge's or justice's unlimited cost-of-living increases.

Judicial pensioners whose benefits are based on judicial services terminating before the effective date of applicable law providing for unlimited cost-of-living increases, have no *vested* right to benefits resulting therefrom. Legislation providing for unlimited cost-of-living increases was first enacted in 1964 to become effective on 1 January 1965, although the statute then provided for quadrennial increases based on a different index than the CPI. (Stats. 1964, First Ex. Sess., ch. 144, p. 518, § 4.) However, it is not necessary for our purposes to determine a judicial pensioner's right as being *vested*. Vested or not, a pensioner's right entitles him or her to benefits based on the prevailing salary for the judge or justice occupying the particular judicial office, regardless of the date of termination of judicial services giving rise to the pension.[6] Finally, as in the case of judges or justices who enter upon a new or unexpired term of a predecessor judge after 31 December 1976, benefits of judicial pensioners based on the salaries of such judges will be governed by the 1976 amendment.[7]

---

[6]Even pre-1965 pensioners are entitled to percentage participation in judicial salaries actually paid or to be paid under compulsion of law to judges or justices occupying the judicial office to which the retired or deceased judge or justice was last elected or appointed.

[7]We note that in *Betts* this court held the pensioner was entitled to both the benefit of a basic retirement allowance calculated as a proportionate part of the fluctuating salary of the incumbent in the office occupied by the pensioner and, additionally, a cost-of-living adjustment of the basic allowance. We stated then that the effect of the holding "is that petitioner thereby receives the benefit of a *double* increment of increase, a troubling result." (*Betts* v. *Board of Administration, supra*, 21 Cal.3d 859, 867.) The net effect of our holding in the instant case is to allow a judicial pensioner but one increment of increase, that being the increment of pro-rata increase in the salary of the judge occupying the office formerly occupied by the retired or deceased judge. While that salary fluctuates with cost-of-living increases, the judicial pensioner's proportionate share is his basic retirement allowance and it is not increased by any cost-of-living factor.

## REDUCTION OF JUDICIAL SALARIES AS A VIOLATION OF CALIFORNIA CONSTITUTION, ARTICLE III, SECTION 4

■ Judges are state officers. (Cal. Const., art. VI, §§ 1, 16; see also *Spreckles* v. *Graham* (1924) 194 Cal. 516 [228 P. 1040].) Therefore, the prohibition against reducing state officers' salaries includes judicial salaries. (See fn. 2, *ante*.)

The word "salaries" in Proposition 6 (see fn. 2, *ante*) must bear the same meaning in both contexts in which it appears in that constitutional provision. (See *Miller* v. *Dunn* (1887) 72 Cal. 462, 466 [14 P. 27].) Legislative history demonstrates that the provision "[l]aws that set these salaries are appropriations" was drafted in 1972 to forestall the effect of a budgetary "line-item" veto. Such a veto could not effectively eliminate funding for an existing provision of law—such as judges' salaries including a cost-of-living increase—when the statute is an appropriation. The word "salaries" in the last sentence of Proposition 6 is thus intended to mean cost-of-living salaries because the appropriating law then provided for annual cost-of-living adjustments. It follows that the provision in Proposition 6 that "[s]alaries of elected state officers may not be reduced during their term of office" forecloses during that term any limitation on cost-of-living increases even though such increases were first provided by the Legislature during that same term. To the extent that the 1976 amendment to Government Code section 68203 contemplates such limitations it is unconstitutional.

Policies underlying Proposition 6 support our interpretation. The primary purpose of that constitutional provision is to "strengthen the independence of all three branches of the government,"[8] including the judiciary. Security of both tenure and subsistence are important factors in creating and maintaining an independent judiciary. These factors are

---

*Betts* is distinguishable on the ground that, unlike the instant case, there was express legislative direction mandating the cost-of-living adjustment be applied to the fluctuating basic retirement allowance. (*Id.*, at p. 865.) It was thus necessarily held that since statutes establishing *both* the fluctuating basic retirement allowance and the cost-of-living adjustment thereto were in effect during the pensioner's term in office, he had acquired vested contractual rights to the dual benefits. In the instant case legislation exists directing increases—cost-of-living or otherwise—in the basic retirement allowance, although that allowance itself may fluctuate depending on adjustments —cost-of-living or otherwise—in salaries of incumbent judges.

[8]Excerpt from Arguments in Favor of Proposition 6, signed by Bruce W. Summer, Chairman of the Constitutional Revision Commission, Senator Nicholas G. Petris, and Assemblyman Robert G. Beverly.

met by insuring relatively long, fixed terms of office (Cal. Const., art. VI, § 16; Gov. Code, § 71145) and foreclosing reduction in salary during term of office. Should the state arbitrarily limit the cost-of-living salary, the level of subsistence would be reduced.

Defendants rely on *Atkins* v. *United States* (1977) 556 F.2d 1028 [214 Ct.Cl. 186]. *Atkins* involved a claim by federal judges that Congress unconstitutionally reduced salaries by refusing to increase salary levels in the face of continuing inflation. However, the federal judges, unlike plaintiff judges, did not have the benefit of a guaranteed statutory cost-of-living provision. Moreover, no action was ever taken to place a limitation on salaries already fixed by Congress. In contrast, the Legislature has provided California judges with a cost-of-living provision as part of their established salaries.

## APPLICABILITY

. Having concluded the 1976 amendment to Government Code section 68203 infringes upon constitutionally protected rights when applied to some but not to all judges, it is apparent that if so applied salary disparity among peer judges will result. ■ While it is established that the Legislature may create different salary levels for different officers or employees performing similar duties (see Gov. Code, § 18850 et seq.; *Sevier* v. *Riley* (1926) 198 Cal. 170 [244 P. 323]; *Crawford* v. *Payne* (1936) 12 Cal.App.2d 485 [55 P.2d 1240]), a further question arises whether an enactment which has immediate constitutional application in some instances but only prospective application in others, satisfies constitutional requirements.

The issue raised is not one of severability in the usual sense. No part of the enactment is constitutionally infirm and therefore no question arises as to whether part of the enactment taints the remainder so as to render the whole a nullity. (See *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 330-335 [118 Cal.Rptr. 637, 530 P.2d 605]; *In re Blaney* (1947) 30 Cal.2d 643, 655 [184 P.2d 892].) Further, the amendment to section 68203 is incapable of mechanical severance and must survive, if at all, as a wholly integrated enactment. If it does so survive, then its application to particular judges during their protected terms of office must be deferred to the end of each such term.

The issue presented has been dealt with by this court in similar factual situations. ■ The court has concluded that when an enact-

ment suffers from a temporary constitutional defect its applicability is merely delayed until such time as the constitutional bar ceases to exist. In *Busch* v. *Turner* (1945) 26 Cal.2d 817 [161 P.2d 456, 171 A.L.R. 1063], legislation increasing salaries of public officials was confronted with a constitutional provision precluding an increase in compensation during a term in office. Before the term of one such official had expired the constitutional provision was amended and implementing legislation was enacted removing the bar to an increase in the official's compensation. This court held that the provision for increased compensation was merely held in abeyance as to that official during the period of the statute's constitutional infirmity, to become applicable when the constitutional bar was removed. After referring to other decisions in which constitutionally inapplicable statutes were deferred until a change of circumstances permitted applicability, the court stated: "These decisions...represent a specific application of the general principle that statutes will be construed, if their language permits, so as to avoid unconstitutionality. The court [in those cases] thus held, in substance, that the Legislature intended the statutes to be operative at the earliest time the Constitution would permit, but not before... 'The old law stands and controls the right to compensation *until the time arrives at which, by the constitution, the new law is permitted to supersede it....'*" (*Id.*, at p. 820; see also *Regan* v. *County of San Mateo* (1939) 14 Cal.2d 713 [97 P.2d 231]; *Galeener* v. *Honeycutt* (1916) 173 Cal. 100 [159 P.2d 595]; *Smith* v. *Mathews* (1909) 155 Cal. 752 [103 P. 199]; *Harrison* v. *Colgan* (1905) 148 Cal. 69 [82 P. 674]; *Kilroy* v. *Whitmore* (1931) 115 Cal.App. 43 [300 P. 851]; *Shay* v. *Roth* (1923) 64 Cal.App. 314 [221 P. 967].)

While the bar in *Busch* was removed by constitutional amendment and in the instant case the running of a judge's protected term renders the amendment applicable as to him, "[t]he reason why the prohibition ceases to operate is entirely immaterial...." (*Busch* v. *Turner, supra,* 26 Cal.2d 817, 821.) This court concluded in *Busch* that there is "no constitutional objection" to a statutory interpretation giving prospective effect to a provision constitutionally inapplicable on the stated effective date. (*Id.*, at pp. 821-822.)

We adhere to the rule of construction in *Busch* and the cases on which it relies. No different rule is warranted where, as here, the enactment can be applied to different judges at different times. We conclude that the 1976 amendment to Government Code section 68203 fixes salaries of all judges—and benefits of judicial pensioners grounded on

such salaries—except during completion of particular protected terms of office as defined above. In the absence of express legislative intent we should rely on the settled rule of construction presuming legislative intent. Thus in *Busch* it is stated without reference to actual legislative expression that the courts have "in substance" held that the Legislature intended statutes to be operative at the earliest time the Constitution would permit. (*Id.*, at p. 820.) Presumed legislative intent follows in part from the recognized rule that statutes will be construed when possible to avoid unconstitutionality. The 1976 amendment is thus construed to avoid unconstitutionality by a presumed legislative intent that it be temporarily inapplicable to fix salaries of those judges to whom it cannot be constitutionally applied. The same rule of construction and presumed legislative intent is stated by this court in *Smith* v. *Mathews, supra,* 155 Cal. 752 to serve as "precedent for the construction of all future acts of the same character." (*Id.*, at p. 760.) Our presumption of legislative intent is bolstered by the further presumption that the Legislature in adopting the amendment to section 68203 was aware of the existing rule of construction making the amendment prospectively applicable in those instances of temporary constitutional infirmity. (See *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977 [140 Cal.Rptr. 669, 568 P.2d 394]; *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 65 [81 Cal.Rptr. 465, 460 P.2d 137].)[9]

CONCLUSION

■ We conclude that Government Code section 68203 as amended in 1976, insofar as it would limit cost-of-living salary increases as provided by section 68203 before the 1976 amendment, cannot be constitutionally applied to (1) a judge or justice during any term of office, or unexpired term of office of a predecessor, if the judge or justice served some portion thereof (a "protected term") prior to 1 January 1977, and (2) a judicial pensioner whose benefits are based on some proportionate amount of the salary of the judge or justice occupying that office.

The salaries of judges and justices as fixed on 1 September 1976 constituted equal compensation for all judges and justices in a particular

---

[9]The Legislature has clearly indicated its intent, in recognition of vested interests, to provide minimum levels or to afford elections by which differing levels of compensation may become available to judicial pensioners. (See, e.g., Gov. Code, §§ 75060.1, 75060.2, 75075.1, 75076, 75090, 75090.1, 75090.2, 75090.3, 75093, 75094, 75095, 75095.1.) The Legislature has thus indicated its inclination to accommodate constitutionally compelled innovations in preservation of the substance of its legislative policies.

peer group (the "base salary"). (See Gov. Code, §§ 68200-68203.) Salaries for judges and justices never having served in a protected term are fixed by the legislative scheme to be at any time the 1976 base salaries increased annually by the percentage increase in the CPI not to exceed 5 percent, beginning on 1 July 1978 (the "statutory salary"). However, salaries for judges and justices while serving a protected term will be increased above the 1976 base on 1 September each year beginning 1977, by the percentage increase in the CPI for the prior calendar year. There will thus be a disparity in salaries within a peer group of judges or justices while any judge or justice within that group continues to serve a protected term. Such disparity will continue, in the case of trial judges, no later than the first Monday in January 1981 and, in the case of appellate justices, no later than the first Monday in January 1987. (Cal. Const., art. VI, § 5, subd. (a), § 16, subd. (a); Gov. Code, § 71145.)

A judge or justice who completes a protected term and voluntarily embarks upon a new term can no longer claim to serve in a protected term, and his or her compensation will thereafter be governed by the provisions of section 68203 as amended in 1976.[10] While that section speaks of annual increases in the salaries of "each justice or judge" by a percentage of the then current salary of "such justice or judge," we do not deem this to mean that the salary of a judge or justice at the end of a protected term will be the salary at which the judge or justice commences a new, unprotected term should he or she succeed himself or herself. As stated (*ante*, pp. 544-545), section 68203 becomes fully applicable upon expiration of a protected term and it follows that the benefits derived from constitutional protections during that term cannot be projected into an unprotected term. Thus the salary at which any unprotected term is commenced—including the salary of a judge or justice leaving a protected and embarking upon an unprotected term—is the statutory salary then paid to judges or justices of equal rank who never served during a protected term.[11] Although a salary of a judge or justice serving a protected term will be decreased upon entering a new term, such a result is constitutionally permissible as such a judge or justice

---

[10]In addition to the running of its course, a protected term may otherwise end, as by death of the incumbent, by retirement, by election or removal to another office, or by other departure from office.

[11]The deferred application of the 1976 amendment is not a right applying to a particular judicial office. Upon termination of a protected term, a judge or justice who succeeds to the judicial office—including the incumbent—will be entitled only to that salary provided by sections 68200 through 68202, inclusive, as applicable, and amended section 68203.

has voluntarily embarked or will voluntarily embark upon a new term for which there was or is a legislatvely designated compensation.[12]

The judgment is affirmed as to any judge or justice who served any portion of his term or the unexpired term of a predecessor prior to 1 January 1977, and as to judicial pensioners whose benefits are based on the salary of such a judge or justice. In all other respects the judgment is reversed. All parties shall bear their own costs on appeal.[13]

Manuel, Acting C. J., Mosk, J., Richardson, J., Racanelli, J.,* and Brown (G. A.), J.,* concurred.

NEWMAN, J.—I dissent. One year ago, in another politically sensitive case, I quoted Learned Hand as follows (*People* v. *Tanner* (1979) 24 Cal.3d 514, 538 [156 Cal.Rptr. 450, 596 P.2d 328]): "'When we ask what Congress [or another legislature] "intended", usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion.' *(United States* v. *Klinger* (2d Cir. 1952) 199 F.2d 645, 648.) The distinguished justice added, 'He who supposes that he can be certain of the result, is the least fitted for the attempt.'"

How might this salary case have been decided if each of us on the court had projected himself conscientiously into the 1964, 1969, 1972, and 1976 positions of those legislators who "uttered the words" that are contained in the legislative measures pertinent here? In 1969, for instance, what if a legislator in debate (or the Legislative Counsel, in his summary) had stated, "Interested observers have noted that (1) for incumbent appellate judges, increases based on the Consumer Price Index will irrevocably be guaranteed until those judges' terms expire, and (2) for some incumbents the terms will not expire until 1982"?

---

[12]We note that judicial salaries have in all instances been paid in accordance with section 68203 as amended in 1976.

[13]The composition of the court in this case having been approved by the parties at the commencement of hearing, we deem as moot the question of disqualification inappropriately addressed in the dissenting opinion.

*Assigned by the Acting Chairperson of the Judicial Council.

What if a legislative committee chairman had advised: "For each judge you are being asked to approve an 'employment contract' and to endorse his or her 'promised compensation' [*ante* at pp. 538, 539]. The bill as now drafted means you are about to adopt 'agreements of employment...[that] are binding and constitutionally protected' [*ante*, p. 538]. Its 'full cost-of-living provision' would require our State to pay all judges 'the represented compensation [including full cost-of-living increases] for their terms of office'; that is, for some judges until 1982—more than 12 years from now [*id.*]. Further, regardless of the salaries that, in future years, laws will set for *all other state officers and employees*, the Legislature may never impair the contracts with judges that this bill would adopt unless there is some '"emergency" serving to protect "a basic interest of society"' [*ante*, p. 539]."

In brief summary, I dissent here because I am persuaded that no evidence whatever suggests that the California Legislature ever intended (1) to promise judges anything, (2) to adopt any formally recognized "agreements of employment" [*ante* at p. 538], or (3) to preclude modification by statute of cost-of-living adjustments that demonstrably were experimental and tentative.

If this court's 1980 views had been forecast by anyone, if slide-rule projections of the now grotesquely swollen and embarrassingly out-of-line salaries—cultured anachronically in the medium of the Consumer Price Index plan—had been reported, if the pay scales that now have won the majority's blessing had earlier been arrayed in full Winchester Mystery House splendor,* I think it is inconceivable that the legislators would have enacted and left unchanged the pending proposals—in 1969, for unrestricted use of the Consumer Price Index and, in 1972, for rigidifying by Assembly Constitutional Amendment not only the salaries of elected state officers but also (as hindsight now seems to counsel) the unique salary-adjustment-formula for incumbent judges.

---

*See the letter of May 13, 1980, addressed to Acting Chief Justice Manuel by counsel for petitioners Kirkpatrick et al.: "[We] have just received a copy of the amicus curiae brief submitted on behalf of Edmund G. Brown, Jr., Governor.... [¶] The Governor agrees with petitioners' basic position that this Court's opinion creates unequal and unreasonable levels of compensation for judges on the same court and improperly establishes salary levels for some members of lower courts which are greater than the compensation paid to some members of higher courts. The Governor's brief...argues that the Opinion has 'created an administrative nightmare' for both the Controller's office and the Judges' Retirement System based upon the 'fortuitous dates the terms of office of their successors began and ended.'... [¶] We thoroughly agree with these comments...."

Finally, as will be explained, I think my colleagues have failed to answer several arguments ably set forth in the Court of Appeal opinion in this case (by Fleming, J., with Roth, P. J., and Beach, J., concurring).

## I. *Contractual and vested rights*

Does the 1976 amendment to Government Code section 68203 impair contractual or vested rights? If so, prior to the amendment exactly what contractual rights did the section vest in the judges who took office before January 1, 1977?

The section then read, "[O]n the effective date of the 1969 amendments to this section and on September 1 of *each year thereafter* the salary of each justice and judge...shall be increased by that amount which is produced by multiplying [etc.]." (Italics added.) The justices and judges referred to were those "named in Sections 68200 to 68202." The names appearing in those sections were "the Chief Justice...and each Associate Justice of the Supreme Court," the "[p]residing justice or associate justice of a court of appeal division," each "[j]udge of the superior court," and each "[j]udge of a municipal court." Did the Legislature mean the incumbents only? Obviously not. Those who took office after the original enactment and after amendment were included too.

However, with regard to each individual justice and judge did the Legislature express or imply any intent as to "term of office"? I think not. The statute nowhere mentions anybody's term. Instead it specifies "each year thereafter." Until when? I submit that "each year thereafter" meant each year until the statute was amended or repealed, with no extra years to be set by terms of office.

Public officers and employees may, of course, enter into salary and wage agreements with the state; and by statute the Legislature may articulate the terms of the agreements. But section 68203 is not that kind of statute. The majority of the legislators never would have approved the law, I believe, had they been advised that its words created a contractual right to cost-of-living increases that would survive amendment or repeal. There was no contract because there was no offer or acceptance. "[E]ach year thereafter" was designed as a legislative, not a contractual, phrase.

Salary and wage contracts that bind employers, including public employers, typically contain definite dates. Is it not startling for the

majority here to rule that a statute referring only to "each year there-after [indefinitely]" nonetheless creates a binding contract to pay certain salaries during particular terms of office? I believe there was no binding contract, and thus I identify no rights that could have been impaired.

Indeed, it was the absence from salary statutes of vested rights to compensation for services not yet rendered that necessitated the constitutional prohibition of reductions in elected officers' salaries during their terms of office (art. III, § 4). It is neither necessary nor fitting for this court to add to that constitutional protection a judicially contrived right, purportedly contractual, that is not enjoyed by the thousands of other public officers and employees who serve indefinite tenures.

As to (1) pensioners, and (2) the judges who took office on or after January 1, 1977, I am persuaded by these excerpts from Justice Fleming's opinion: "[T]he rights of judicial pensioners are directly tied to those of sitting judges and take the form of a floating pension proportionate to the comparable current judicial salary. We have heretofore concluded that, absent any reduction in the dollar amount of the pension, judicial pensioners' rights are dependent upon sitting judges' rights to salary, and, if a prospective increase in salary for sitting judges does not materialize, the pensioners have no independent grounds for complaint. Any contractual rights for future increases in judicial salary and any vested or accrued rights to future increases in judicial salary are not the rights of the pensioners. Consequently, any impairment or infringement of such rights only indirectly and secondarily affects judicial pensioners and gives them no separate cause to complain. (Cf. *Harrison v. Colgan* (1905) 148 Cal. 64, 73 [82 P. 674].) The pensioner floats in water whose origin is the current judicial office, and like water his rights cannot rise above their source.

"*Newly-elected Judges.* Nor do newly-elected or newly-appointed judges have cause to complain of prior legislative change in the future salary of the office to which the judge has been elected or appointed. Such judges did not serve under the old dispensation and could have no legitimate expectation of the continuance of cost-of-living increases in salary under the old law, in that the law had already been changed prior to their assumption of office."

## II. *The constitutional mandate*

The next question is whether the 1976 amendment to section 68203 conflicts with the constitutional prohibition of reductions in salaries. The question is difficult. I believe that it is answered correctly in Justice Fleming's opinion as follows: "Before discussing this constitutional issue we first note the general considerations that lead to constitutional prohibitions against reductions in the salaries of judicial officers during their term of office. The key objective is to create and maintain an independent judiciary, and the key factors thought to bring this about are security of tenure and security of subsistence. Both factors appear in the federal Constitution, which declares that judges shall hold office during good behavior and receive a compensation which shall not be diminished during their continuance in office. (U.S. Const., art. III, § 1.) As observed by the Supreme Court in *Evans* v. *Gore* (1920) 253 U.S. 245, 252 [64 L.Ed. 887, 892, 40 S.Ct. 550, 11 A.L.R. 519], in turn quoting Hamilton in The Federalist, No. 79, '[a] power over a man's subsistence amounts to a power over his will.' That court further noted the constitutional premise that protection of a judge's subsistence is not so much for the benefit of the judge as it is for the public interest in the preservation of an independent judiciary. (*Evans* v. *Gore, supra*, at pp. 248-254 [64 L.Ed. at pp. 890-893].)

"These basic constitutional premises find expression in the California Constitution, which gives judges the protection of relatively-long fixed terms (appellate judges, 12 years; trial judges, 6 years (art. VI, § 16)) and which prevents reductions in judges' salaries during their term of office (art. III, § 4).

"Factually, reductions in judicial salary may come about in four different ways:

"(1) Reduction in dollar amounts of judicial salaries.

"(2) Increased specific deductions against judicial salaries.

"(3) Increased general deductions against all salaries.

"(4) Reduction in purchasing power of all salaries.

"Clearly, if the Legislature had undertaken to reduce the dollar amounts payable as salaries to judges (item 1), or had undertaken to

deduct increased amounts from judicial salaries for pension contributions or the like and thereby brought about an absolute reduction in judges' salaries (item 2), the constitutional prohibition against reduction in salary during a judge's term of office would come into play. (Cf. *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 451 [326 P.2d 484].) Neither of these events has occurred. Nor has any complaint been made of reduction in judicial salaries as a consequence of a general tax imposed on all salaries (item 3), which was the issue in *Evans* v. *Gore* (1920) 253 U.S. 245 [64 L.Ed. 887, 40 S.Ct. 550, 11 A.L.R. 519], the case which exempted the salaries of federal judges from the then newly-imposed general income tax. The reduction complained of here is related to the loss in purchasing power for all salaries (item 4). Plaintiffs do not directly complain of loss of purchasing power in judges' salaries as a result of inflation and the depreciating value of the dollar, the issue unsuccessfully raised in *Atkins* v. *United States* (Ct.Cl. 1977) 556 F.2d 1028, cert. denied (1978) 434 U.S. 1009 [54 L.Ed.2d 751, 98 S.Ct. 718], but they present the point in indirect form by arguing that removal during an inflationary period of statutory protection against increases in the cost-of-living constitutes a reduction in salary contrary to article III, section 4 of the California Constitution. Plaintiffs argue that sitting judges during 1969 to 1976 had a legal expectation of annual increases in salary commensurate with increases in the cost-of-living as shown by the California consumer price index, a legal expectation that constituted a valuable part of their compensation, and that any diminution in the amount of such increases during their term of office effected an unconstitutional reduction in salary. Plaintiffs conclude that article III, section 4, which forbids reduction in salary during a judge's term of office, likewise forbids modification of future salary increases called for under an automatic cost-of-living formula.

"Of equal general importance to this cause is another provision of the California Constitution, article VI, section 19, which authorizes the Legislature to prescribe compensation for judges of courts of record. That provision confers on the Legislature 'the fullest measure of control, direction, ordination, and dictation over the matter of the amount and payment of judicial salaries....' (*Sevier* v. *Riley* (1926) 198 Cal. 170, 175 [244 P. 323].) Absent some constitutional or statutory provision to the contrary, the salaries of all public employees, including judges, may be modified by legislative action. No officer or employee of the State of California has an immutable vested right to any specific salary. (*Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 150 [82 P.2d 434, 126 A.L.R. 838]; *Miller* v. *Kister* (1885) 68 Cal. 142, 144 [8 P. 813];

cf. *Miller v. State of California* (1977) 18 Cal.3d 808, 813 [135 Cal.Rptr. 386, 557 P.2d 970].)

"Plaintiffs' constitutional challenge to the 1976 amendment to section 68203 asserts that article III, section 4, which prohibits any reduction in the *salaries* of elected state officers during their term of office, not only qualifies the Legislature's plenary power to adjust current judicial salaries but prohibits legislative adjustment during a judge's term of office in the cost-of-living formula established in 1969 by section 68203. In opposition, defendant argues that the legislative attempts in 1964 and 1969 to solve the perennial controversy over judicial salaries by adopting a cost-of-living formula to determine future judicial salaries, did not bind the Legislature to maintain indefinitely any particular cost-of-living formula for future judicial salaries. The constitutional issue posed is whether the 1976 modification of prospective cost-of-living increases in salary constituted a reduction in *salaries* as that term is used in the Constitution.

"A. *The History of Article III, Section 4, Does Not Support Plaintiffs' Interpretation of Its Meaning.*

"Plaintiffs assert that article III, section 4, was expressly intended by the Legislature to prohibit revision of the prospective cost-of-living adjustments contained in section 68203. In support of their assertion plaintiffs submitted to the superior court materials which related to the background of the enactment of article III, section 4.

"From these materials it appears that in 1971 the then Governor attempted to prevent the 1970 cost-of-living increase for judges from coming into effect by a line-item veto of a budget appropriation which covered the increase in judicial salaries. The Attorney General gave an opinion to the Controller which concluded that 'Section 68203 does not, of itself, appropriate funds necessary to support the increase required by Section 68203 . . . ,' that although judicial salaries remained payable at the new and higher rate, they could not be paid except to the extent funds for the payment of judicial salaries had been appropriated. Thus, if the Governor were to adhere to his position, judicial salaries would be paid at the increased rates, but the funds appropriated to pay such salaries would become exhausted before the close of the fiscal year. On an annualized basis the veto would become effective to prevent full compliance with section 68203. Push did not come to shove, however, and the potential future fiscal crisis was averted when the Governor withdrew

his line-item veto. Thereafter, the chairman of the Constitution Revision Commission personally drafted an amendment to the constitutional revision then under consideration in the Legislature, an amendment which added the second sentence to what is now section 4 of article III. 'Salaries of elected state officers may not be reduced during their term of office. *Laws that set these salaries are appropriations.*' (Italics ours.) This additional sentence remained in the final legislative version of the Constitution adopted by the electorate in November 1972.

"From this incident plaintiffs argue that the proponents of article III, section 4, expressly intended to prevent modification of prospective salary adjustments under section 68203—that is, to forbid future legislative modification of the automatic cost-of-living formula then contained in that section, even for future years and for future salary levels. This speculation seems wide of the mark. Plainly the proponents and draftmen of article III, section 4, meant to prevent a repetition of the line-item veto incident, a goal achieved by the second sentence of article III, section 4, which converts a salary law such as section 68203 into an appropriation and renders unnecessary a separate budget appropriation which a governor could veto. But it is one thing to view article III, section 4, as protective of salary increases that have become due and payable, and another to argue, as do plaintiffs, that it also prevents modification of all prospective salary adjustments. We find nothing in the legislative history of article III, section 4, and nothing in the 1971 veto incident to support that argument.

"Nor can plaintiffs derive support for their interpretation of article III, section 4, from the ballot arguments presented to the voters at the time of the adoption of the constitutional revision in November 1972. The arguments in the ballot pamphlet submitted to the voters were not only devoid of any disclosure of intent and purpose to prevent modification of prospective judicial salary adjustments, but to the contrary they suggested the absence of any such purpose. Insofar as they related to article III, section 4, the ballot arguments stated:

"'A provision would be added to prohibit any reduction in the salaries of elected state officers during their term of office and to provide that laws setting those salaries are appropriations. *This would eliminate the existing requirement that there be a specific appropriation* enacted in the Budget Act, or otherwise, *to pay salaries.*'[1]

---

"[1]Excerpt from the ballot pamphlet entitled, 'Detailed Analysis by the Legislative Counsel.'

"'The *various revisions* and deletions of existing language in the State Constitution proposed by this amendment *will not result in any cost or revenue changes.'*[2]

"'Proposition 6 also protects elected State officers in all three branches of government by providing that their salaries can't be reduced during the term for which they were elected and makes salary statutes appropriations. *This will not increase the cost of government or cost the taxpayers more,* but will strengthen the independence of all three branches of government.'[3] (Italics added.) No reference was made to section 68203 or, indeed, to any aspect of the cost-of-living adjustment issue, other than the general statements that adoption of article III, section 4, 'will not increase the cost of government or cost the taxpayers more' and 'will not result in any cost or revenue changes.'

"In short, the history of article III, section 4, indicates it was directed against a perceived evil—attempts by veto of appropriations to prevent payment of increased judicial salaries after cost-of-living adjustments had gone into effect and become due and payable. The materials before the court suggest that those who drafted article III, section 4, those who voted to put it on the ballot, and those who voted in its favor, never considered or intended that adoption of article III, section 4, would freeze into the constitutional landscape the statutory experiment in judicial cost-of-living salary adjustments set out in section 68203.

"B. *Prospective Cost-of-Living Increases Are Not Salaries Within the Meaning of Article III, Section 4.*

"Plaintiffs' challenge to the 1976 amendment to section 68203 raises the question whether prospective cost-of-living increases—that is, increases which have not yet gone into effect—are *salaries* within the meaning of article III, section 4 of the Constitution. Two settled principles of constitutional law are relevant. The first is the presumption of constitutionality to which all legislation is entitled. (See, e.g., *California*

---

"[2]Excerpt from the ballot pamphlet entitled, 'Cost Analysis by the Legislative Analyst.'

"[3]Excerpt from 'Argument in Favor of Proposition 6,' signed by Judge Bruce W. Sumner, Chairman of the Constitution Revision Commission, Senator Nicholas C. Petris, and Assemblyman Robert G. Beverly.

*Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) The second is the canon that 'where the Legislature has by statute adopted a reasonable construction of a constitutional provision its action has strong persuasive force and will ordinarily be followed.' (*Woodcock* v. *Dick* (1950) 36 Cal.2d 146, 148 [222 P.2d 667]; see also *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 652 [298 P.2d 1]; *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P.26].) At bench, the Legislature's implicit construction in 1976 that the word *salary* in article III, section 4, does not include prospective cost-of-living increases, was reasonably contemporaneous with its approval of article III, section 4, in 1972.

"Section 68203, as it existed when article III, section 4, was drafted and adopted, provided that on September 1 of each year 'the salary of each justice or judge shall be increased' by an amount determined by multiplying the 'then current salary' by the percentage increase in the California consumer price index. The use of the future tense 'shall' and the reference to 'then current salary' indicate that the Legislature did not view a prospective cost-of-living increase as part of a judge's *salary* until that increase became due and was added to 'then current salary' to become the salary payable for the next 12 months. Likewise, *salary* is defined in the Judges' Retirement Law (Gov. Code, § 75003) as 'the compensation *received* by a judge as the emolument of the office of judge' (italics added). This definition obviously does not embrace compensation payable in the future after cost-of-living adjustments have been made; clearly, under section 75003 a judge's salary is the compensation he is currently being paid.

"In *Harrison* v. *Colgan* (1905) 148 Cal. 69 [82 P. 674], the California Supreme Court, in a somewhat related context, refused to treat a prospective salary increase as included within the term *salary*. That case involved a constitutional provision entitling justices of District Courts of Appeal to the same salaries as justices of the Supreme Court. In 1905 the Legislature raised the annual salaries of Supreme Court justices from $6,000 to $8,000. However, due to the then constitutional prohibition against increases in the salaries of judges during their term of office, no Supreme Court justice was eligible to claim the higher salary until 1907, when two justices would begin to serve new terms.

Plaintiff, a justice of a District Court of Appeal, claimed that because he had been appointed after the effective date of the 1905 increase, he was entitled to the higher salary under the constitutional provision making the salaries of District Court of Appeal justices the same as those of Supreme Court justices. The Supreme Court rejected this claim stating: '*What, then, are the salaries of the justices* of the supreme court to which those of the district court justices must for the present conform? *Clearly not the salaries* which may *hereafter* be payable under the amended statute when a new term of some of the justices of the supreme court shall have begun, but the present salaries now allowed and paid by them by law.' (*Harrison* v. *Colgan* (1905) 148 Cal. 69, at p. 72; italics added.) In other words, even though Supreme Court justices might have a future right to an increase in compensation, until the increase became effective it could not be considered *salary* within the meaning of the provision entitling District Court of Appeal justices to the same *salary* as Supreme Court justices. The *salary* of a Supreme Court justice was what he was then being paid. So here. The salary of an elected state officer is the amount he is presently being paid. For example, if in January 1976 the Legislature in its wisdom had passed a law making the salary of a Court of Appeal justice for the calendar year 1977 the same as that of a Supreme Court justice, and had then repealed the law in February 1976, thus returning future Court of Appeal salaries to their original amounts, under the reasoning of *Harrison* the prospective increase which never materialized could not be considered *salary*, and no reduction in salary would have occurred by reason of the repeal. Although former section 68203 provided that judges would receive annual cost-of-living increases, those future increases did not become *salary* within the meaning of article III, section 4, until they had become payable as current salary.

"To conclude the point, salary is present pay, not future pay.

"C. *Elimination of a Prospective Increase in Salary Is Not a Reduction in Salary.*

"Although no California court has decided the precise issue, three New Jersey cases have rejected the argument that elimination of a prospective increase in salary constitutes a reduction in salary. (*Greenway* v. *Board of Education* (1943) 129 N.J.L. 461 [29 A.2d 890, 145 A.L.R. 404]; *Offhouse* v. *State Board of Education* (1944) 131 N.J.L. 391 [36 A.2d 884]; *Kopera* v. *Bd. of Ed. of Town of West Orange*,

*Essex Co.* (1960) 60 N.J.Super. 288 [158 A.2d 842, 846].) In *Greenway, supra,* a New Jersey statute prohibited local school boards from reducing teachers' salaries. A local board's existing teachers' salary schedule, which provided future incremental salary increases for teachers, was repealed by the local board as an economy measure during the depression. A teacher contended that the repeal of the prospective increase by the local board constituted an impermissible reduction in salary contrary to the state statute. The New Jersey court disagreed, holding that increments do not become part of a teacher's salary until they accrue, and that until accrual their modification does not constitute a reduction in salary. (29 A.2d at p. 891.) In *Offhouse, supra,* the court made the same point: 'Only accrued increments under a valid and subsisting regulation of the local board are beyond repeal. Unaccrued increments do not take the classification of 'salary' within the intendment of [the statute].' (36 A.2d at p. 887.) And in *Kopera, supra,* the court said: 'The failure to receive an increase of salary does not constitute a reduction.' (158 A.2d at p. 846.)

"Plaintiffs seek to distinguish these cases on the ground that they deal with a mere statutory prohibition against salary reductions and not with a constitutional prohibition. Such a suggestion misconceives the issue. The New Jersey statute, like the constitutional provision at issue here, prohibited salary reductions; the issue there, as here, was whether repeal by a subordinate body of prospective increases it had previously authorized constituted a reduction in *salary* within the meaning of the statutory prohibition. The New Jersey courts held it did not, stating: 'Until the accrual, the modification or repeal of the rule providing for increments does not constitute a reduction of salary within the intendment of [the statute]. A regulation providing for increments is a mere declaration of legislative policy that is at all times subject to abrogation by the local board in the public interest.' (*Offhouse* v. *State Board of Education, supra,* 36 A.2d at p. 887.) The New Jersey cases thus furnish valuable precedent for resolution of the issue at bench.

"Apart from precedent, however, other fundamental considerations must be taken into account. The Constitution gives the Legislature ultimate responsibility for fixing judicial salaries (art. VI, § 19) nd for fixing other governmental salaries as well. In 1964 the Legislature first experimented with a system for automatically adjusting judicial salaries to the cost-of-living. By 1976, however, that experiment, viewed from the legislative perspective of state salaries as a whole, had produced an

imbalance as a result of a salary structure which provided full cost-of-living adjustments for only one group of officers of only one branch of government. Obviously, the Legislature might have responded to imbalance by raising all state salaries to meet the pressures of inflation. For reasons of political economy it chose not to do so. Such concerns are the responsibility of the legislative branch, whose task in salary setting is difficult, delicate, and troublesome. The complexity of its task counsels judicial caution in construing article III, section 4 of the Constitution so broadly that any experiment with a new mechanism for determining future salary increases becomes cast in constitutional stone. . . .

"Plaintiffs' interpretation of article III, section 4, if accepted, would seriously cripple the power of the Legislature to take effective action in an important and sensitive area of its concern—its fixing of judicial salaries pursuant to article VI, section 19, of the Constitution. Under plaintiffs' interpretation the Legislature would become a kind of sorcerer's apprentice—able to turn on the money spigot but never able to shut it off. It is one thing to insist, as the Constitution does, that a present salary, once established, may not be reduced during a judge's term of office; it is another to argue that a legislative experiment to find a better mechanism for setting judicial salaries has been transmuted into an irreversible economic grant. Our constitutional tradition, exemplified by such decisions as *Atkins* v. *United States* (Ct.Cl. 1977) 556 F.2d 1028, cert. denied (1978) 434 U.S. 1009 [54 L.Ed.2d 751, 98 S.Ct. 718], entrusts to the Legislature broad authority and responsibility over increases in judicial salaries. (Cal. Const., art. VI, § 19.) We reject plaintiffs' argument that article III, section 4 of the California Constitution precludes adjustment of future salary increases throughout a judge's term of office."

### III. *Disqualification of judges*

Questions as to who should have adjudged this lawsuit were notably more troubling than Justice Clark's brief discussion of the Rule of Necessity implies (*ante*, p. 537).

On January 16, 1978, counsel for plaintiffs (Messrs. Levit and Chernick) and defendant (Mr. Falk) stipulated as follows: "The parties waive their right to make any motion pursuant to Code of Civil Procedure Section 170.6 as to judges Harry L. Hupp and Ernest J. Zack if

this action is assigned to either of such judges but reserve their right to make any motion permitted by law if the case is assigned to any other judge...."

That reference to Code of Civil Procedure section 170.6 was significant. It is the section that governs the imperative challenge of a trial judge. Its potential impact was documented in *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182 [137 Cal.Rptr. 460, 561 P.2d 1148]; cf. Martini, *Legislators Urged to End Affidavit of Trial Judges*, The Los Angeles Daily Journal (Dec. 12, 1979) page 1; letter from Maynard Craig, *id.*, (Jan. 10, 1980) page 4. Since January 16, 1978 (the date the stipulation was filed), imperative challenges seem not to have been an issue in this case.

On November 22, 1978, Messrs. Levit and Chernick filed plaintiffs' brief in the Court of Appeal. They stated: "Respondents offered to stipulate that the case be assigned to a judge pro tem (for example, a retired federal judge, a law school dean or professor, or the like) so that no judge who was affected by the litigation would be required to decide the matter. (C.T. 17-18.) Appellant declined such offer, but in any event (as Appellant concedes (C.T. 303)), under the Rule of Necessity, *no California judge is disqualified from hearing this case.* That rule has been uniformly recognized to operate to permit and require judges to determine causes in which all judges are financially interested in order to preserve access to the courts. In other words, if all judges are disqualified, none are." (Italics added.)

Notwithstanding counsel's contention that "it is not susceptible to doubt that...[the Court of Appeal, 2d District] is qualified, authorized, and required to decide the instant case,"[1] Justices Lillie, Thompson, and Hanson on March 13, 1979, requested "that Division One be relieved of any and all further action in the within appeal." (See their letter appended here as Annex A.) On March 20, an order signed by Acting Chief Justice Tobriner transferred the cause from Division One of the Court of Appeal to Division Two.

---

[1]Footnote 3 of plaintiffs' brief reads: "*See e.g., Evans* v. *Gore* (1920) 253 U.S. 245; *Miles* v. *Graham* (1925), 268 U.S. 501; *O'Malley* v. *Woodrough* (1939), 307 U.S. 277; *Atkins* v. *United States* (Ct. Cl. 1977), 556 F.2d 1028, 1035-1040, cert. denied (1978), 434 U.S. 1009, 98 S.Ct. 718. The same rule has been applied in California, and it is not susceptible to doubt that this court is qualified, authorized, and REQUIRED to decide the instant case [capitalization added]. *Cf. Brenkwitz* v. *City of Santa Cruz* (1969), 272 Cal.App.2d 812, 77 Cal.Rptr. 705 (Rule of Necessity Applied to city council engaging in reassessment procedure); *Barkin* v. *Board of Optometry* (1969), 269

The Lillie-Thompson-Hanson letter (Annex A) is noteworthy because for the first time in this case, apparently, Code of Civil Procedure section 170, subdivision 1 was mentioned. It appears to disqualify a justice or judge from sitting in any action when she or he is "a party" or is "interested." (Because so many lawyers and judges recently seem to have discussed section 170 without evident awareness of its exact words, I append it here as Annex B.) Notwithstanding the absence of any reference to the "rule of necessity" in the code section, Justices Lillie, Thompson, and Hanson observed that it ". . . no doubt would permit us to sit and act on this appeal".

On June 11, 1979, the opinion of Division Two of the Court of Appeal (Justices Fleming, Roth, and Beach) was issued; and matters pertinent to disqualification were disposed of as follows: "Members of this court may adjudicate the cause even though each is financially interested in the outcome of the litigation. Ordinarily, a justice may not pass judgment on any cause in which he has a personal interest, but when all justices in the state are, or may be, financially interested in the outcome, any of them may sit. (*Evans* v. *Gore* (1920) 253 U.S. 245 [64 L.Ed. 887, 40 S.Ct. 550, 11 A.L.R. 519]; *Atkins* v. *United States* (Ct.Cl. 1977) 556 F.2d 1028, 1035-1040, cert. den. (1978) 434 U.S. 1009 [54 L.Ed.2d 751, 98 S.Ct. 718]; *Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 366 [139 P.2d 908]; *Brenkwitz* v. *City of Santa Cruz* (1969) 272 Cal.App.2d 812, 818 [77 Cal.Rptr. 705]; *Barkin* v. *Board of Optometry* (1969) 269 Cal.App.2d 714, 719-720 [75 Cal.Rptr. 337]; *Gonsalves* v. *City of Dairy Valley* (1968) 265 Cal. App.2d 400, 404-405 [71 Cal.Rptr. 255].) In such instances . . . disqualification of all judges disqualifies none. The application of this rule has been discussed at length in *Atkins* v. *United States, supra*, a class action on behalf of all federal judges to recover additional compensation for their services as judges, and the exhaustive discussion of the issue in *Atkins* (pp. 1035 to 1040) makes further discussion here unnecessary. Under the rule of necessity this court, to which the cause was transferred by the California Supreme Court, is *both qualified and obligated* to decide the cause [italics added]."

Cal.App.2d 714, 719-720, 75 Cal.Rptr. 337 (statutory application of rule); *Gonsalves* v. *City of Dairy Valley* (1968), 265 Cal.App.2d 400, 404-405, 71 Cal.Rptr. 255 (rule is well settled that where an administrative body has a duty to act upon a matter before it and is the only entity capable of acting in the matter, the fact that members may have personal interest in the result of the action taken does not disqualify them from performing their duty)."

Plaintiffs' counsel then wrote the letter of July 20, 1979, to Chief Justice Bird and Justice Tobriner, that is appended here as Annex C. The next-to-last paragraph reads, "It is respectfully submitted that the above circumstances [see paragraphs 3 to 6 of the letter] suggest the appearance of possible bias and prejudice on the part of the Chief Justice and Justice Tobriner with respect to the basic issues involved in this case, and that they therefore should disqualify themselves."

Annex C first discusses Annex D here, which the Chief Justice and Justice Tobriner wrote on June 16, 1978, as Chairperson and Vice Chairperson of the Judicial Council. Annex C then recites that "Jerome B. Falk, Jr., Esq., the principal attorney for the defendant and appellant herein, is acting as co-counsel for the Chief Justice in a matter now pending before the Commission on Judicial Performance." That "matter," of course, was the 1979 partly public, partly private investigation of all seven Supreme Court justices.

In three letters dated September 24 and 26, 1979 (Annexes E, F, and G here), plaintiffs' counsel suggested that Acting Chief Justice Manuel and Acting Justices Brown and Racanelli withdraw from the case.[2] Unlike the Chief Justice and Justice Tobriner, they did not recuse and, instead, participated in oral argument and in the calendar conference and have signed the majority opinion.

---

[2] In cases that arguably were politically sensitive one law firm involved here has seemed uniquely alert as to the possibilities of removing justices. See, e.g., page 6 of the letter dated March 14, 1978 in *State of South Dakota* v. *Brown* (1978) 20 Cal.3d 765 [144 Cal.Rptr. 758, 576 P.2d 473] ("It would be appropriate for this Court in effect to withdraw from the case..."); also the footnote reading as follows on page 5 of the statement and declaration filed on May 14, 1979 in *In re Governorship* (1979) 26 Cal.3d 110 [160 Cal.Rptr. 760, 603 P.2d 1357]: "Neither Sections 170 and 170a nor the cases decided thereunder provide clear guidance as to whether the members of this Court appointed by Governor Brown...should be recused in a case involving that same Governor's powers of appointment vis-a-vis those of a Lieutenant Governor who is from an opposing political party. It would seem clear that the public's confidence in the process by which a decision is reached in this case, in the decision itself, and in the judiciary, could only be strengthened by withdrawal of those justices from the deliberations in this case...."

Cf. the Chief Justice's remarks on August 11, 1978, at the *Amador* argument (appended here as Annex H). On December 28, 1979, erroneous news stories *re Brown* v. *Curb* reported that "Bird disqualified herself because she was appointed by Brown." (See, e.g., the A. P. dispatch on p. 1 of the Contra Costa Times.) My understanding is that she recused herself because she chairs the Commission on Judicial Appointments and was therefore a party to the action. Note too Justice Tobriner's reply to Judge Arabian regarding that case (Annex N here); also the comments on possible disqualification because of campaign contributions in *The Robed Politician*, 2 L. A. Law. (Mar. 1979) pages 10, 30.

In sum, no trial judges but five appellate judges recused themselves in this case—three of them even though there was no challenge. Three others refused to recuse after challenge. An unfortunately unanswered question is whether the justices who did recuse did so for reasons regarding impartiality that in fact seem more compelling than every judge's conceded interest concerning the amount of her or his monthly salary.

By participating in this case the seven justices here have respected the rule of necessity. Yet the majority opinion cites only *Atkins, supra,* 556 F.2d 1028. The most informative discussion I know of the perplexities and scope of the rule appears in section 12.04 of Professor Davis' Administrative Law Treatise (plus his supplements) (hereafter Davis Treatise). His conclusions are etched by these introductory comments in section 12.03, which deals with "Interest": "One who stands to gain or lose personally by a decision either way is disqualified by reason of interest to participate in the exercise of judicial functions. Most of the law concerning disqualification because of interest applies with equal force to judges and to administrative adjudicators. [Fn. omitted.] *The overshadowing and almost overwhelming fact about the law of disqualification for interest is that,* as we shall see in the ensuing section, *most of that law is largely defeated by the rule of necessity.*" (Italics added.)[3]

Is it possible that my colleagues overlooked or ignored a corollary to the rule of necessity that might well have had a significant impact? That corollary is that judges who but for the rule would have been disqualified should exemplify a bend-over-backwards stance; that is to say, they should approach the proffered legal issues with both marked and exceptional care. (See the Davis Treatise at p. 166: "Whatever the principles...for ordinary cases, the extraordinary cases which impel courts to resort to the rule of necessity may often deserve extraordinary scrutiny...." See also pp. 358-359 of Davis, Administrative Law: Cases—Text—Problems (6th ed. 1977): "The easy and seemingly automatic application of the rule of necessity is more dangerous than is recognized in typical judicial opinions, for grave injustice may result from allowing disqualified officers to adjudicate cases....[An] escape

---

[3]Regarding the parameters of "interest," the Davis conclusion is that "[a]n affidavit charging bias is properly ignored when it alleges 'an impersonal prejudice'." (Treatise at p. 146.) Further, "The case law is clear and consistent that an attitude about law or policy or facts is not 'personal' unless it involves animosity toward a party, as distinguished from issues, or favoritism toward an opposite party." (*Id.*)

route...is...to review both more broadly and more intensively when the rule of necessity is invoked than when no bias gives rise to use of the rule of necessity.") Is it perhaps regrettable that the words of the majority opinion disclose no honoring of that approach here?

### A. For what reasons should judges be disqualified?

In California the law governing disqualification includes (1) Code of Civil Procedure sections 170 (Annex B here) and 170a to 170.8, plus a few unrelated statutes (e.g., Prob. Code, § 703; Gov. Code, §§ 11512, subd. (c) and 87101); (2) certain clauses in the state and federal Constitutions; (3) certain canons of judicial conduct and comparable rules; and (4) countless written opinions of courts and other adjudicative bodies. (A brief bibliography is appended here as Annex O; see too Annex K.)

Interestingly, counsel in Annexes C, E, F, and G do not stress that law. It is surprising that, in so many California cases where disqualification issues have arisen, lawyers and judges have proceeded to argue and decide the issues without appropriate search and citation. Disqualification law is perhaps less complex than tax law, say, or corporate securities law; but *by no means is it accurately portrayed in judges' and law professors' folklore, news commentators' assumptions, or lawyers' untutored assertions.* "Bias," "prejudice," "fair and impartial," "interest," and related words are like so many words in our state's laws. For enlightenment, legal research is essential. The chances are that reliable guidance only rarely will be found in newspaper and TV editorials, speeches at bar meetings, and common catechisms.

### B. Should a judge continue to sit even when she or he would like to withdraw from a case?

The oath of office requires that each judge "well and faithfully discharge the duties" of judging. That means, I believe, that none of us should recuse herself or himself merely because a litigant so requests. Nor should a judge recuse merely because she or he thinks there is too much other work to do, or wants to get off the hot seat, or is fearful that participation and relevant rulings might inspire criticism, ridicule, or political attack.

Prior to the enactment of Code of Civil Procedure section 170.6 (the procedure for imperative challenges of a trial judge), this court de-

clared: "Under the Constitution of this state a superior judge has certain powers and duties to perform. Upon assuming his office he takes and subscribes to an oath that he will support the state and federal Constitutions and that he will faithfully discharge the duties of his office as a judge of the superior court to the best of his ability.... One of those duties is to hear and determine causes presented to him unless in a particular cause he is disqualified or unable to act. He may not evade or avoid that duty. *In proceedings too numerous to need citation of authority a superior judge has been required to discharge that duty when no good cause appeared to justify a refusal to act.*" *Austin* v. *Lambert* (1938) 11 Cal.2d 73, 75 [77 P.2d 849, 115 A.L.R. 849] (italics added).

Those words, I submit, still govern every appellate judge and, absent a proper imperative challenge, every trial judge. (See also *Swan* v. *Talbot* (1907) 152 Cal. 143, 144 [94 P. 238].)

Also pertinent are these widely known comments of Justice Rehnquist in 1972: "Every litigant is entitled to have his case heard by a judge mindful of [the federal] oath. But neither the oath, the disqualification statute, nor the practice of the former Justices of this Court guarantees a litigant that each judge will start off from dead center in his willingness or ability to reconcile the opposing arguments of counsel with his understanding of the Constitution and the law...." (409 U.S. at p. 838 [34 L.Ed.2d at p. 61].) Further, "...I conclude that the applicable statute does not warrant my disqualification in this case. Having so said, I would certainly concede that fair-minded judges might disagree about the matter. If all doubts were to be resolved in favor of disqualification, it may be that I should disqualify myself simply because I do regard the question as a fairly debatable one, even though upon analysis I would resolve it in favor of sitting. [¶] Here again, one's course of action may well depend upon the view he takes of the process of disqualification. THOSE FEDERAL COURTS OF APPEALS THAT HAVE CONSIDERED THE MATTER HAVE UNANIMOUSLY CONCLUDED THAT A FEDERAL JUDGE HAS A DUTY TO *SIT* WHERE *NOT DISQUALIFIED* WHICH IS EQUALLY AS STRONG AS THE DUTY TO *NOT SIT* WHERE DISQUALIFIED." (409 U.S. at p. 836 [34 L.Ed.2d at p. 60]; italics his, capitals mine; see Note, *Justice Rehnquist's Decision to Participate in* Laird v. Tatum (1973) 73 Colum.L.Rev. 106; cf. Aryeh Neier's review of The Brethren in The Nation (Feb. 2, 1980) pp. 118, 120: "At the time Douglas recused himself, my view was that he wanted to avoid casting the deciding vote upholding flag desecration while the effort to impeach

him was still smoldering. A controversy over the flag could have ignited it again. I would have been happy to find another view in *The Brethren* instead of misinformation that could have been easily avoided."[4])

### Concluding Remarks

Part III of this opinion reflects a hope that further discussion of recusal and disqualification may be nurtured. My intent is to imply no criticism of any judge. Like Justice Rehnquist (quoted above), I note that, "fair-minded judges might disagree." Yet I believe strongly that the troubling issues should be aired and that precedential rulings should not be entombed in unpublished orders and other papers available only in court clerks' offices.

I have not yet discussed procedures for disqualification. The rules are complex. Not enough is known about them or their history in California, especially as to appellate judges. Appropriate analysis requires the untangling of a morass of precedents and practices that unjustifiably would lengthen my comments here. (See the brief discussion of Code Civ. Proc., § 170.6 at the beginning of my Part III, above; cf. the 2d par. (et seq.) of subd. 5 of § 170 (Annex B here), which governs trial judges only.)

New law on the role of substitute courts and the rule of necessity that could have great procedural impacts was indorsed in *Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 482 [159 Cal.Rptr. 494, 601 P.2d 1030] ("where...all the Supreme Court justices were ultimately disqualified, the Chief Justice is empowered to make the assignment [of pro tem justices] under the rule of necessity"). (Cf. Kleps, *Disqualifications,*

---

[4]"[M]ust [judges] yield to every imagined charge of conflict of interest, regardless of the merits, so long as there is a member of the public who believes it? No. Surely there can be some objective content to any inquiry into whether the 'appearance of justice' has been compromised in a given case. The complaining party or the public must have a reasonable fear that judicial impartiality is in jeopardy. Courts can handle such an inquiry despite its subjective qualities, since they deal all the time with concepts of reasonableness—enforcing the Fourth Amendment's ban on unreasonable searches and seizures, for example, or basing civil liability on whether a driver or pedestrian behaved reasonably under the circumstances." (MacKenzie, The Appearance of Justice (1974) p. 240.)

*Substitute Courts and Assigned Judges*, L. A. Daily Journal (Oct. 3, 1979); and see the last paragraph of Annex P here; also Annex Q.[5])

For full awareness of the innumerable rules that do affect the well and faithful discharge of judges' duties, not only our consciences but

---

[5]With regard to the disqualification of appellate judges by their colleagues, footnote 2 of the *Mosk* case opinion reports that, on motion by the Commission on Judicial Performance, "this court subsequently found and declared [on Sep. 19, 1979] that Justice Newman was disqualified from participating in this case." (25 Cal.3d at p. 480.) There is no mention of the fact that on August 6, 1979, the same court, except for one member not yet appointed, at its first conference filed a formal and public order denying that commission's motion to disqualify (Newman not participating). Annex J here is the September 19th disqualification order of the four justices who wrote neither an opinion nor an explanation. The unpublished dissenting opinions of Justices Miller and Hopper are appended as Annexes K and L. (Cf. Kleps, *Should Judges Use Lawsuits To Raise Judicial Issues?* L. A. Daily J. (Nov. 8, 1979) at p. 2.)

The views of my twelve colleagues (six Supreme Court and six Court of Appeal justices) regarding which Court of Appeal justices ought to be excluded from the 1979 substitute court might to astute observers appear perplexing. The first order declared that "replacement by lot [of the six Supreme Court justices who recused]" should not result in the assignment of "Justice Bertram D. Janes...and the four members of Division Two of District Two, all of whom are party litigants." The second order, issued after Justice Jefferson's withdrawal, ensured that his name would not again be selected. The third order, following Newman's disqualification, also excluded "Justices...Alarcon and Thompson." I do not know why they were named. Nor do I know why Justice Racanelli was not named since, though he had withdrawn from the Judicial Performance Commission's Supreme Court inquiry, he still was a member of the commission and thus arguably a party litigant.

That not just Supreme Court but also Court of Appeal justices might someday be affected by commission proceedings opened to the public seems to have concerned no one. Nor did the 11 justices who prescribed the various "by lot" selections evidence any concern regarding certain Court of Appeal justices whose very strong views on public vs. private proceedings were known.

Is it worth mentioning that the four justices who finally disqualified Newman seemed unconcerned that their unprecedented order, accompanied by no opinion or explanation, might later affect even them personally, as potentially it might affect every Court of Appeal justice?

On August 6, 1979, Justice Jefferson stated: "I deny that I possess any interest, bias, prejudice, or other mental attitude which would preclude me from acting objectively, fairly and impartially in the above entitled matter. Nevertheless, I have no desire or wish to sit on this case in which a party thereto has expressed a belief that I will not be able to objectively, fairly and impartially determine the issues involved. Consequently, I am herewith withdrawing as one of the justices selected to sit in this matter...." He may have had good reasons; but I believe that a litigant's mere expression of a belief does not itself justify the recusal of an appellate judge, ever. (Cf. the Mitchell, Silberberg & Knupp letter of Aug. 2, 1979, attached here as Annex M.)

Uniquely intriguing are the statements of recusal filed by at least 11 Court of Appeal justices in *McComb* v. *Commission on Judicial Performance* (1977) 19 Cal.3d Spec.Trib.Supp. 1 [138 Cal.Rptr. 459, 564 P.2d.1]. The Supreme Court apparently decided against recusal in *McComb* v. *Superior Court* (1977) 68 Cal.App.3d 89, 99 [137 Cal.Rptr. 233] ("application for a hearing...denied").

also both substantive and procedural requirements will have to be searched and researched with much care. Temptations to recuse and formal motions for disqualification are likely to multiply because (1) more and more lawyers may decide to exploit challenges as newly honed weapons of advocacy, and (2) challenges inevitably will be part of the now-recognized and disturbing politicization of many judicial concerns. (Cf. fn. 3, *ante*; *People* v. *Tanner* (1979) 24 Cal.3d 514, 545-546 [156 Cal.Rptr. 450, 596 P.2d 328].) California will benefit, I suggest, if its judges respond to those problems as they do to the many other problems involving law that often confound us sorely but impede us not.

The petition of appellant Cory for a rehearing was denied May 30, 1980. Bird, C. J., and Tobriner, J., did not participate therein. Brown (G. A.), J.,* and Racanelli, J.,* participated therein. Newman, J., and Racanelli, J.,* were of the view that the petition should be granted and then rendered the following separate opinions dissenting to the denial of rehearing.

NEWMAN, J.—Dissenting. On May 30, 1980, five justices concluded (1) that in this case there should be no rehearing, and (2) that nonetheless their "opinion" must be modified. I set forth here (in Part I) the reasons for my belief that a rehearing is needed and also (in Part II) the modifications of my earlier opinion that, because of the majority's modifications and because of facts and arguments that seem to me to appear only in the rehearing documents, I now regard as essential. I dissent:

PART I. *Why is a rehearing needed?*

The California Constitution in article VI, section 14 distinguishes between "opinions of the Supreme Court" and "[d]ecisions of the Supreme Court." As to opinions, the only express commands in the Constitution are (1) that the Legislature provide for prompt publication of those the court deems should be published, and (2) that the opinions so selected be available for publication by any person.

The command that affects decisions is notably more comprehensive. Whenever decisions "determine causes [they] shall be in writing with reasons stated." There are no exceptions. Yet what has happened in this

---

*Assigned by the Acting Chairperson of the Judicial Council.

case, apparently, is that the majority while purporting to modify their *opinion* have in fact modified their *decision*. Have they stated any reasons? The answer is No. Therefore it seems that they have acted unconstitutionally. (See too Cal. Rules of Court, rule 24(a): "...Where an opinion is modified without change in the judgment...such modification shall not postpone the time that the decision becomes final...; but if the judgment is modified...the period specified herein begins to run anew, as of the date of the modification.")

In what critical respects has the decision here been altered? The majority now decide first, that judges serving protected terms should not get a salary that "will continue after 1 January 1977 to increase in proportion to the CPI" (see the first sentence in fn. 9 of their original opinion, which is being deleted); and second, that a judicial pensioner must suffer correspondingly (i.e., the base for his or her benefit after the expiration of a protected term may not reflect a salary that has increased in proportion to the Consumer Price Index).

Also, certain judges and pensioners will be affected by the new holding that a protected term, even when it has not expired by running its course ("in the case of trial judges, no later than the first Monday in January 1981 and, in the case of appellate justices, no later than the first Monday in January 1987"), nonetheless will be deemed terminated "by death of the incumbent, by retirement, by election or removal to another office, or by other departure from office." (See the majority's new fn. 10. ) Inexplicably, that is so notwithstanding the phrase "a judge elected to an unexpired term serves the remainder of the term" that appears in article VI, section 16, subdivision (a) of the California Constitution.[1]

---

[1]What does the majority mean, I wonder, by these words: "If salary benefits are diminished...during the unexpired term of a predecessor judge (see Cal. Const., art. VI, § 16; Gov. Code, §§ 71145, 71180), the judge is nevertheless entitled to the contracted-for benefits during the remainder of such term" (*ante,* at p. 539)?

Note too the majority's deletion of "for the office" from the last two paragraphs of the opinion (26 Cal.3d at pp. 686-687: "judicial pensioners whose benefits are based on...the salary for the office of such a judge").

By no means does that deletion resolve uncertainties created by the phrase "salary of the judge or justice occupying that office" that completes the introductory sentence of the majority's new CONCLUSION. For instance, what if nobody occupies the office?

Also puzzling are the words "incumbent," used at least three times in the majority opinion, and "particular judicial office," used at least four times. The phrases "office to which the retired or deceased judge was last elected or appointed" and "the office formerly occupied by the retired or deceased judge" also appear. (See 26 Cal.3d at pp. 681-682.)

No reasons have been put forth to justify those alterations. Thus the Constitution's command that "[d]ecisions...be in writing with reasons stated" has been disregarded.

Further, this court still does not know exactly who among the judges and pensioners may adversely be affected by the alterations. Yet many of them have not been heard, within the meaning of due process requirements, because they received no notice of any intent so to modify the initial decision. To accord the opportunity to be heard is a compelling reason why rehearing should be granted. We should not pretend that the majority's modifications are inherently or demonstrably uncontestable.[2]

In addition we should not pretend that the briefs and other papers received here since March 27 merely restate arguments that were considered by the court prior to issuance of the initial opinions. On the contrary the new focus on practical complexities and inequities, which indeed are troubling, requires thorough reanalysis of the majority's original assumptions and presumptions regarding legislative intent.[3]

---

I have not discussed the majority's second "Modification of Opinion" (filed today), which also alters the March 27th decision and states no reasons. Apparently it was inspired by the petition of plaintiffs "For Further Modification of Opinion" that was filed on June 3, 1980.

[2]Compare this excerpt from the letter of April 14, 1980, to Acting Chief Justice Manuel by the Chairman of the Presiding Judges' Association of Los Angeles County: "Up to now we thought our interests were being looked out for by the attorneys representing the named plaintiffs in said case. Since the decision has come down, however, we have found that the decision itself has created numerous conflicting interests which make it impossible for the attorneys to fairly represent all of us. Some wish to let the decision stand while others of us are strongly in favor of the granting of a Petition to Reconsider and/or a Petition for Intervention. The attorneys representing the entire class find it impossible to fairly represent all of us.... [¶] I urge you in the strongest terms possible to permit every judge in the State of California the opportunity to be properly heard and represented in this matter if he so elects. This should be done either through a Petition For Reconsideration, a Petition For Intervention or by some other proper means at your disposal. In the absence of such due process has no meaning." (Cf. *Metropolitan Water Dist.* v. *Adams* (1942) 19 Cal.2d 463, 476: On rehearing, "if reasonable opportunity to be heard is afforded the litigants...no federal constitutional guarantees are violated.")

[3]See Kleps, *The Judicial Salary Disaster*, Los Angeles Daily Journal (Apr. 18, 1980) at page 3: "Justice Newman makes a point with which your commentator (as one who discussed the legislation with legislators in 1964 and 1969) can agree fully. 'The majority of the legislators would never have approved the law, I believe, had they been advised that its words created a contractual right to cost-of-living increases that

PART II *Modifications of the dissenting opinion*

*1. The last paragraph commencing on page 231 of 27 Cal.3d is deleted; and these two paragraphs are added on page 234, immediately following the first two lines*:

By participating in this case the seven justices here have respected the rule of necessity. Yet the majority opinion cites only *Atkins, supra,* 556 F.2d 1028. The most informative discussion I know of the perplexities and scope of the rule appears in section 12.04 of Professor Davis' Administrative Law Treatise (plus his supplements) (hereafter Davis Treatise). His conclusions are etched by these introductory comments in section 12.03, which deals with "Interest": "One who stands to gain or lose personally by a decision either way is disqualified by reason of interest to participate in the exercise of judicial functions. Most of the law concerning disqualification because of interest applies with equal force to judges and to administrative adjudicators. [Fn. omitted.] *The overshadowing and almost overwhelming fact about the law of disqualification for interest is that,* as we shall see in the ensuing section, *most of that law is largely defeated by the rule of necessity.*" (Italics added.)[3]

Is it possible that my colleagues overlooked or ignored a corollary to the rule of necessity that might well have had a significant impact? That corollary is that judges who but for the rule would have been disqualified should exemplify a bend-over-backwards stance; that is to say, they should approach the proffered legal issues with both marked and exceptional care. (See the Davis Treatise at p. 166: "Whatever the principles...for ordinary cases, the extraordinary cases which impel courts

---

would survive amendment or repeal.'... [¶] One would not urge a court to reconsider its decision on the basis of a threatened adverse popular reaction. In a case of this sort, however, where the issue is so fundamental and where the consequences can be so grave, a further look might not be amiss. Any doubt that exists in any justice's mind should be resolved in favor of the Legislature's power to control judicial salaries, particularly in light of current economic conditions."

Cf. *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 319: "We are persuaded by the claim that the Legislature intended to treat all local government employees and officers in a uniform manner, and that to distinguish in the application of the condition between employees who had a contractual right to a wage increase and those who did not, or between employees of charter cities and counties and those operating under general laws would violate that intention."

to resort to the rule of necessity may often deserve extraordinary scrutiny. . . ." See also pp. 358-359 of Davis, Administrative Law: Cases—Text—Problems (6th ed. 1977): "The easy and seemingly automatic application of the rule of necessity is more dangerous than is recognized in typical judicial opinions, for grave injustice may result from allowing disqualified officers to adjudicate cases. . . . [An] escape route. . .is. . .to review both more broadly and more intensively when the rule of necessity is invoked than when no bias gives rise to use of the rule of necessity.") Is it perhaps regrettable that the words of the majority opinion disclose no honoring of that approach here?

2. *Footnotes 2 and 3 are inverted, and "2" substituted for "3" on p. 233.*

3. *The paragraphs that follow are substituted for the paragraph that introduces the opinion beginning on page 219 of 27 Cal.3d:*

I dissent. One year ago, in another politically sensitive case, I quoted Learned Hand as follows (*People v. Tanner* (1979) 24 Cal.3d 514, 538): "'When we ask what Congress [or another legislature] "intended", usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion.' (*United States v. Klinger* (2d Cir. 1952) 199 F.2d 645, 648.) The distinguished justice added, 'He who supposes that he can be certain of the result, is the least fitted for the attempt.'"

How might this salary case have been decided if each of us on the court had projected himself conscientiously into the 1964, 1969, 1972, and 1976 positions of those legislators who "uttered the words" that are contained in the legislative measures pertinent here? In 1969, for instance, what if a legislator in debate (or the Legislative Counsel, in his summary) had stated, "Interested observers have noted that (1) for incumbent appellate judges, increases based on the Consumer Price Index will irrevocably be guaranteed until those judges' terms expire, and (2) for some incumbents the terms will not expire until 1982"?

What if a legislative committee chairman had advised: "For each judge you are being asked to approve an 'employment contract' and to endorse his or her 'promised compensation' [*ante* at pp. 538, 539].

The bill as now drafted means you are about to adopt 'agreements of employment...[that] are binding and constitutionally protected' [*ante*, p. 538]. Its 'full cost-of-living provision' would require our State to pay all judges 'the represented compensation [including full cost-of-living increases] for their terms of office'; that is, for some judges until 1982—more than 12 years from now [*id.*]. Further, regardless of the salaries that, in future years, laws will set for *all other state officers and employees*, the Legislature may never impair the contracts with judges that this bill would adopt unless there is some '"emergency" serving to protect "a basic interest of society"' [*ante*, p. 539]."

In brief summary, I dissent here because I am persuaded that no evidence whatever suggests that the California Legislature ever intended (1) to promise judges anything, (2) to adopt any formally recognized "agreements of employment" [*ante* at p. 538], or (3) to preclude modification by statute of cost-of-living adjustments that demonstrably were experimental and tentative.

If this court's 1980 views had been forecast by anyone, if slide-rule projections of the now grotesquely swollen and embarrassingly out-of-line salaries—cultured anachronically in the medium of the Consumer Price Index plan—had been reported, if the pay scales that now have won the majority's blessing had earlier been arrayed in full Winchester Mystery House splendor,* I think it is inconceivable that the legislators would have enacted and left unchanged the pending proposals—in 1969, for unrestricted use of the Consumer Price Index and, in 1972, for rigidifying by Assembly Constitutional Amendment not only the salaries of elected state officers but also (as hindsight now seems to counsel) the unique salary-adjustment-formula for incumbent judges.

Finally, as will be explained, I think my colleagues have failed to answer several arguments ably set forth in the Court of Appeal opinion in this case (by Fleming, J. with Roth, P. J. and Beach, J. concurring).

*See the letter of May 13, 1980, addressed to Acting Chief Justice Manuel by counsel for petitioners Kirkpatrick et al.: "[We] have just received a copy of the amicus curiae brief submitted on behalf of Edmund G. Brown, Jr., Governor.... [¶] The Governor agrees with petitioners' basic position that this Court's opinion creates unequal and unreasonable levels of compensation for judges on the same court and improperly establishes salary levels for some members of lower courts which are greater than the compensation paid to some members of higher courts. The Governor's brief...argues that the Opinion has 'created an administrative nightmare' for both the Controller's office and the Judges' Retirement System based upon the 'fortuitous dates the terms of office of their successors began and ended.'... [¶] We thoroughly agree with these comments...."

**RACANELLI, J.\*—Dissenting.**

I join in the separate dissenting opinion Part I of Justice Newman. The failure to grant rehearing and to permit intervention by those petitioning classes of judges and pensioners treated unequally under our original decision works a manifest injustice to such discriminated classes who have been effectively foreclosed from independently asserting their respective interests. (Cf. Code Civ. Proc., § 387, subd. (b).) Moreover, the sensitive institutional policy questions raised by that decision mandate rehearing in order that such unresolved issues may be fully considered and determined.

---

\*Assigned by the Acting Chairperson of the Judicial Council.

ANNEX A

**Court of Appeal**

**STATE OF CALIFORNIA**
SECOND APPELLATE DISTRICT
3580 WILSHIRE BOULEVARD
**LOS ANGELES, CALIFORNIA 90010**

March 13, 1979

The Supreme Court of California
4250 State Building
455 Golden Gate Avenue
San Francisco, California 94102

> Re: Olson et al. v. Cory
> 2 Civ. No. 53608

Chief Justice and Associate Justices

The appeal in the above entitled class action for declaratory relief is awaiting disposition in Division One, all briefs having been filed. Defendant Cory, State Controller, has appealed from a judgment in favor of plaintiffs entered by stipulation of the parties on a minute order overruling a general demurrer. The only issue is the constitutionality of the 1976 amendment to section 68203, Government Code, relating to payment of judicial salary and benefits. The individual plaintiffs include judges of the superior and municipal courts, retired judges and a widow of a judge of the superior court. The first cause of action of the complaint alleges that the action is brought on behalf of all judges of courts of record in the State of California, all retired judges entitled to receive pensions under the Judges Retirement Law and all widows of judges who are entitled to receive a pension thereunder.

Section 170, subdivision 1, Code of Civil Procedure, prohibits a justice or judge from sitting or acting in any action "To which he is a party; or in which he is interested other than as a holder or owner of any capital stock . . ." Originally, noting that all judges of courts of record in California were "unavoidably personally interested" in the outcome of the action, plaintiffs offered to stipulate pursuant to Article VI, Section 21, California Constitution, that the cause be decided by a judge pro tem mutually acceptable to the parties, and that his decision be

More

ANNEX A (cont'd.)

The Supreme Court of California
Page 2

accepted as final. Defendant Cory declined to so stipulate. Thereafter, the parties entered into a written stipulation, among other things, waiving the right to make any motion pursuant to Section 170.6, Code of Civil Procedure, as to Judge Ernest J. Zack and another superior court judge if the action was assigned to either one. The cause was assigned to Judge Zack. Appellant's contentions are directed only to the constitutionality of the statute; he raises no issue concerning disqualification of any justice or judge from sitting or acting in this case, under Section 170, Code of Civil Procedure.

Respondents refer to the written stipulation that Judge Zack could hear and decide this action. We note, however, that the Legislature expressly provided for exception to disqualification by written stipulation waiving disqualification only for those certain disqualifications for causes set up in Section 170, subdivisions 2, 3 and 4, but failed to provide any exception to disqualification for causes set forth in subdivision 1 of Section 170. However, we are aware of the "rule of necessity" which no doubt would permit us to sit and act on this appeal. Neither party has offered opposition to its application.

Each of us has assessed his own position in relation to this case. Not only is each of us a party to the action and could be financially affected by the outcome of the appeal, but through the years we have had more than a usual interest in the matter of judicial salary and benefits. In 1973-1974, the undersigned, Justice Robert S. Thompson, served as President of the California Judges Association. Prior to, during and immediately subsequent to his term of office as President, he worked closely with members of the Legislature, the State Controller and the office of the Governor in an effort to better the financial condition of all judges throughout the state, a concern for which he shared with his colleagues in Division One. Our early involvement in the very subject matter pending before us compels our request that Division One be relieved of any and all further action in the within appeal.

We neither know nor are authorized to state for other justices in the Second Appellate District their views in this regard. However, noting that defendants were so desirous of an early appellate disposition of this cause that they agreed that judgment could be entered below on the minute order overruling the

More

ANNEX A (cont'd.)

The Supreme Court of California
Page 3

demurrer, we respectfully invite your attention to Article VI, Section 12 of the California Constitution.

Respectfully,

*Mildred L. Lillie*
Mildred L. Lillie

*Robert S. Thompson*
Robert S. Thompson

*L. Thaxton Hanson*
L. Thaxton Hanson

cc: William H. Levit, Esq.
 1801 Century Park East
 Los Angeles, California 90067

 Gibson, Dunn & Crutcher
 1901 Wilshire Boulevard
 Beverly Hills, California 90201

 Howard, Prim, Rice, Nemerovski,
 Canady & Pollak
 650 California Street, #2900
 San Francisco, California 94108

## ANNEX B

### CHAPTER 3. DISQUALIFICATIONS OF JUDGES

Sec.
170. Grounds; proceedings.
170a. Appellate tribunals.
170b. Repealed.
170.1. Computation of degrees of affinity.
170.5. Repealed.
170.6. Prejudice against party, attorney or interest thereof; motion and affidavit; assignment of another judge, court commissioner or referee; number of motions; continuance, cumulative remedy; severability.
170.7. Judge serving on appellate department, application of section 170.6.
170.8. No qualified judge; assignment of judge.
171 to 173. Repealed.

### § 170. Grounds; proceedings

No justice or judge shall sit or act as such in any action or proceeding:

#### Personal Interest

1. To which he is a party; or in which he is interested other than as a holder or owner of any capital stock of a corporation, or of any bond, note or other security issued by a corporation;

#### Financial Interest

2. In which he is interested as a holder or owner of any capital stock of a corporation, or of any bond, note or other security issued by a corporation;

#### Relationship; waiver of disqualification

3. When he is related to either party, or to an officer of a corporation, which is a party, or to an attorney, counsel, or agent of either party, by consanguinity or affinity within the third degree computed according to the rules of law, or when he is indebted; through money borrowed as a loan, to either party, or to an attorney, counsel or partner of either party, or when he is so indebted to an officer of a corporation or unincorporated association which is a party; provided, however, that if the parties appearing in the action and not then in default, or the petitioner in any probate proceeding, or the executor, or administrator of the estate, or the guardian of the minor or incompetent person, or the commissioner, or the referee, or the attorney for any of the above named, or the party or his attorney in all other or special proceedings, shall sign and file in the action or matter, a stipulation in writing waiving the disqualification mentioned in this subdivision or in subdivision 2 or 4 hereof, the judge or court may proceed with the trial or hearing and the performance of all other duties connected therewith with the same legal effect as if no such disqualification existed;

#### Former counsel

4. When, in the action or proceeding, or in any previous action or proceeding involving any of the same issues, he has been attorney or counsel for any party; or when he has given advice to any party upon any matter involved in the action or proceeding; or when he has been retained or employed as attorney or counsel for any party within two years prior to the commencement of the action or proceeding;

#### Bias or prejudice; declaration by judge; affidavit; objections; consent or answer; determination; new judge

5. When it is made to appear probable that, by reason of bias or prejudice of such justice or judge a fair and impartial trial cannot be had before him.

Whenever a judge or justice shall have knowledge of any fact or facts, which, under the provisions of this section, disqualify him to sit or act as such in any action or proceeding pending before him, it shall be his duty to declare the same in open court and cause a memorandum thereof to be entered in the minutes or docket. It shall thereupon be the duty of the clerk, or the judge if there be no clerk, to transmit forthwith a copy of such memorandum to each party, or his attorney, who shall have appeared in such action or proceeding, except such party or parties as shall be present in person or by attorney when the declaration shall be made.

More

## ANNEX B (cont'd.)

Whenever a judge who shall be disqualified under the provisions of this section, to sit or act as such in any action or proceeding pending before him, neglects or fails to declare his disqualification in the manner hereinbefore provided, any party to such action or proceeding who has appeared therein may present to the court and file with the clerk a written statement objecting to the hearing of such matter or the trial of any issue of fact or law in such action or proceeding before such judge, and setting forth the fact or facts constituting the ground of the disqualification of such judge. Copies of such written statement shall forthwith be served by the presenting party on each party, or his attorney, who has appeared in the action or proceeding and on the judge alleged in such statement to be disqualified.

Within 10 days after the filing of any such statement, or 10 days after the service of such statement as above provided, whichever is later in time, the judge alleged therein to be disqualified may file with the clerk his consent in writing that the action or proceeding be tried before another judge, or may file with the clerk his written answer admitting or denying any or all of the allegations contained in such statement and setting forth any additional fact or facts material or relevant to the question of his disqualifications. The clerk shall forthwith transmit a copy of the judge's consent or answer to each party or his attorney who shall have appeared in such action or proceeding. Every such statement and every such answer shall be verified by oath in the manner prescribed by Section 446 for the verification of pleadings. The statement of a party objecting to the judge on the ground of his disqualification, shall be presented at the earliest practicable opportunity, after his appearance and discovery of the facts constituting the ground of the judge's disqualification, and in any event before the commencement of the hearing of any issue of fact in the action or proceeding before such judge.

No judge who shall deny his disqualification, shall hear or pass upon the question of his own disqualification; but in every such case, the question of the judge's disqualification shall be heard and determined by some other judge agreed upon by the parties who shall have appeared in the action or proceeding, or, in the event of their failing to agree, by a judge assigned to act by the Chairman of the Judicial Council, and, if the parties fail to agree upon a judge to determine the question of the disqualification, within five days after the expiration of the time allowed herein for the judge to answer, it shall be the duty of the clerk then to notify the Chairman of the Judicial Council of that fact; and it shall be the duty of the Chairman of the Judicial Council forthwith, upon receipt of notice from the clerk, to assign some other judge, not disqualified, to hear and determine the question.

If such judge admits his disqualification, or files his written consent that the action or proceeding be tried before another judge, or fails to file his answer within the 10 days herein allowed, or if it shall be determined after hearing that he is disqualified, the action or proceeding shall be heard and determined by another judge or justice not disqualified, who shall be agreed upon by the parties, or, in the event of their failing to agree, assigned by the Chairman of the Judicial Council; provided, however, that when there are two or more judges of the same court, one of whom is disqualified, the action or proceeding may be transferred to a judge who is not disqualified.

A judge who is disqualified may, notwithstanding his disqualification, request another judge, who has been agreed upon by the parties, to sit and act in his place.

##### Certain public works

6. In an action or proceeding brought in any court by or against the Reclamation Board of the State of California, or any irrigation, reclamation, levee, swampland or drainage district, or trustee, officer or employee thereof, affecting or relating to any real property, or an easement or right-of-way, levee, embankment, canal, or any work provided for or approved by the Reclamation Board of the State of California, a judge of the superior court of the county, or a judge of the municipal court or justice court of the judicial district, in which such real property, or any part thereof, or such easement or right-of-way, levee, embankment, canal or work, or any part thereof is situated shall be disqualified to sit or act, and such action shall be heard and tried by some other judge assigned to sit therein by the Chairman of the Judicial Council, unless the parties to the action shall sign and file in the action or proceeding a stipulation in writing, waiving the disqualification in this subdivision of this section provided, in which case such judge may proceed with the trial or hearing with the same legal effect as if no such legal disqualification existed. If, however, the parties to the action shall sign and file a stipulation, agreeing upon some other judge to sit or act in place

More

ANNEX B (cont'd.)

of the judge disqualified under the provisions of this subdivision, the judge agreed upon shall be called by the judge so disqualified to hear and try such action or proceeding; provided, that nothing herein contained shall be construed as preventing the judge of the superior court of such county, or of the municipal or justice court of such judicial district, from issuing a temporary injunction or restraining order, which shall, if granted, remain in force until vacated or modified by the judge designated as herein provided.

**Physical impairment**

7. When, by reason of permanent or temporary physical impairment, he is unable to properly perceive the evidence or properly conduct the proceedings.

**Defaults; eminent domain**

8. Notwithstanding anything contained in subdivision 6 of this section, a judge of the superior court or a judge of the municipal court or justice court of the judicial district, in which any real property is located, shall not be disqualified to hear or determine any matter in which the opposing party shall have failed to appear within the time allowed by law, or as to such of the opposing parties who shall have failed to appear within the time allowed by law, and as to which matter or parties the same shall constitute purely a default hearing; provided, that nothing in this section contained shall be construed as preventing the judge of the superior court of such county from issuing an order for possession prior to judgment in proceedings in eminent domain.

Nothing in this section contained shall affect a party's right to a change of the place of trial in the cases provided for in Title 4 (commencing with Section 392) of Part 2 of this code.

(Enacted 1872. Amended by Code Am.1880, c. 35, § 1; Stats.1893, c. 189, § 1; Stats.1897, c. 190, § 1; Stats.1905, c. 370, § 1; Stats.1915, c. 362, § 1; Stats.1921, c. 153, § 1; Stats.1925, c. 15, § 1; Stats.1927, c. 741, § 1; Stats.1929, c. 556, § 1; Stats 1933, c. 743, § 48; Stats.1937, c. 136, § 1; Stats.1939, c. 1017, § 1; Stats.1941, c. 70, § 1; Stats.1951, c. 1737, § 37; Stats.1957, c 1545, § 1; Stats.1959, c. 741, § 2; Stats.1965, c. 1269, § 1; Stats.1969, c. 446, § 1; Stats.1971, c. 807, § 1; Stats.1975, c. 1240, § 2; Stats.1977, c. 1257, § 6.)

## ANNEX C

William H. Levit
Stroock & Stroock & Lavan
1801 Century Park East
Los Angeles, California 90067

Richard Chernick
Gibson, Dunn & Crutcher
2029 Century Park East
Los Angeles, California 90067

July 20, 1979

Honorable Rose Elizabeth Bird
Chief Justice of California
4250 State Building
455 Golden Gate Avenue
San Francisco, California 94102

Honorable Mathew O. Tobriner
Associate Justice
The Supreme Court of California
4250 State Building
455 Golden Gate Avenue
San Francisco, California 94102

> Re: Olson, et al. v. Cory, et al.
> 2nd Civil No. 53608

Dear Chief Justice Bird and Justice Tobriner:

For the reasons herein set forth, plaintiffs and respondents in this case, through their attorneys, respectfully request that the Chief Justice and Justice Tobriner disqualify themselves from acting or participating in any way in connection with the consideration of and ruling on the pending petition for hearing herein, or in the event a hearing is granted, the consideration of and decision in the matter.

1. This case is a class action brought on behalf of California judges and judicial pensioners involving the constitutionality of the 1976 amendment to Section 68203 of the Government Code which purported to place a freeze on judicial salaries for 22 months and a 5% cap on future cost-of-living increases.

On June 16, 1978, the Chief Justice and Justice Tobriner, purporting to act in their official capacities, respectively, as Chief Justice and Associate Justice of the Supreme Court and Chairperson and Vice Chairperson of the Judicial Council, signed and caused to be sent to each

More

ANNEX C (cont'd.)

Honorable Rose Elizabeth Bird
and Honorable Mathew O. Tobriner
July 20, 1979
Page Two

Presiding Judge in the state for dissemination to all judges,
a letter (copy of which is attached hereto) urging all
California judges to join with them in foregoing the five
percent automatic cost-of-living pay increase payable
July 1, 1978 prescribed by the 1976 amendment to Section
68203, by donating such increase to the state general fund
(or appropriate governmental body).

The June 16, 1978 letter appears to assume the
validity of the 1976 amendment to Section 68203, and, more
importantly, creates the impression that the writers look
with disfavor upon increases in judicial salaries at this
time and consider judges as somehow being under a moral
obligation to reject such increases.

To the best of our knowledge, the writers of the
letter have not withdrawn the suggestion in their letter of
June 16, 1978 although since that date most public employees,
both at the local and state levels, have received or will
shortly receive substantial pay increases many of which are
retroactive.

2. As to the Chief Justice only, attention is
called to the fact that Jerome B. Falk, Jr., Esq., the principal
attorney for the defendant and appellant herein, is acting as
co-counsel for the Chief Justice in a matter now pending before
the Commission on Judicial Performance.

It is respectfully submitted that the above circum-
stances suggest the appearance of possible bias and prejudice
on the part of the Chief Justice and Justice Tobriner with
respect to the basic issues involved in this case, and that
they therefore should disqualify themselves.

More

**584**

Honorable Rose Elizabeth Bird
and Honorable Mathew O. Tobriner
July 20, 1979
Page Three

 We felt it appropriate to make this request in the form of this letter. Should it be decided that in order for this request to be considered a formal motion must be filed, please so advise us.

 Sincerely,

STROOCK & STROOCK & LAVAN GIBSON, DUNN & CRUTCHER

By _William H. Levit_ By _Richard Chernick_
 William H. Levit Richard Chernick

 Attorneys for Plaintiffs and Respondents

WHL:jg
Enc.
cc: Jerome B. Falk, Esq.

ANNEX D

Supreme Court of California
State Building
San Francisco
94102

Rose Elizabeth Bird
 Chief Justice

June 16, 1978

Dear Presiding Judge:

As we are all aware, passage of Proposition '13 mandates immediate economic austerity at all levels of government. In response to that mandate, the Legislature and the Governor are now engaged in a joint effort to formulate appropriate legislation to implement that initiative measure. Budget cuts in a number of programs have already been announced, and decreases in supporting staff and compensation benefits seem inevitable. The Governor has declared a general freeze in state employees' salary increases as part of the effort to make additional state funds available to ameliorate the impact of reduced county revenues.

As an independent branch of government, the judiciary must share in the concern being demonstrated by the legislative and executive branches' efforts to achieve fiscal economies wherever possible. As Chairperson of the Judicial Council, I called a special meeting of the Council on June 10, 1978, in response to the mandate of the voters on June 6th.

At that meeting, the Council decided to strongly urge the Legislature and the Governor to provide total state funding for the trial courts. State funding would relieve county taxpayers of approximately $308 million in taxes during the 1978-79 fiscal year. In addition, the Council resolved to contact all courts, the State Bar, and other groups and persons to solicit their ideas on cutting the operating costs of the courts by up to ten percent. I appointed a special 8-person committee of the Council, joined by California Judges Association President-elect Judge Harry W. Low, to represent the Council's position before the joint legislative conference committee on Wednesday, June 14th.

More

ANNEX D (cont'd.)

The legislative committee has taken the matter under consideration and is not expected to announce its allocation decisions until next week. However, there is a strong possibility that the Legislature may decide neither to approve state funding nor to "earmark" funds for the courts in the event that state money is sent directly to the counties for the boards of supervisors to allocate. In that event, the Council will immediately meet again in special session to explore ways to assist the trial courts in obtaining adequate operational funds at the local level. If you have any suggestions concerning how the Council could best help in such an effort, please write us directly.

In addition, it would be helpful for the Council to have your ideas about possible cost reductions. While the constitutionally mandated nature of many of the services provided by the state judiciary imposes inherent limitations on potential cutbacks, nonetheless it is most important that each court carefully review its budget and administrative operations in order to identify specific areas where economies may be effected without compromising the basic functions of the courts and without diminishing the quality of justice.

Again, let us stress that the Judicial Council needs your ideas and suggestions so that it may best assist the courts in securing adequate local funding should neither state funding nor "earmarked" state funds be approved by the legislative and executive branches.

This is a time when everyone in government is being called upon to bear heavier burdens and to conserve public fiscal resources. Although the Council has not taken a formal position on this, one of the more immediate economies that can be accomplished by voluntary action is in the area of judicial salaries. Under the provisions of Government Code section 68203, judges will be entitled on July 1st to automatic cost-of-living pay increases in the amount of five percent of their present salaries. The total cost of these increases will amount to nearly $2.6 million for fiscal year 1978-1979.

It may be that there are some in the judiciary who will want to donate their five percent raise back to the state general fund (or the appropriate governmental body) so as to share part of the burden which other employees of the people of this state are being asked to shoulder. Of course, such a decision must be made on an individual basis, and some may conclude that family or other financial considerations make such a donation unfeasible. However, if you are inclined to forego your pay increase, we welcome

More

ANNEX D (cont'd.)

you to join those of us who have already informed the State Controller of our decision to voluntarily relinquish the cost-of-living increase. I personally discussed this suggestion with a number of justices on the state Courts of Appeal early this week. The justices of the Third Appellate District have already publicly declared their intention to waive the five percent salary increase. (See attached article.) We are hopeful that other judges will follow a similar course of action. In taking actions such as this, we, as an independent branch of government, can responsibly manifest our collective concern and willingness to shoulder a proportionate part of the cost burden posed by decreased local tax revenues.

Thank you for your assistance and cooperation during this difficult time of transition.

Sincerely,

Rose Elizabeth Bird
Chief Justice and
 Chairperson of the
 Judicial Council

Mathew O. Tobriner
Associate Justice and
 Vice Chairperson of the
 Judicial Council

cc: Members of the Judicial Council
 Judge Harry W. Low, CJA President-elect

Attachment

3

### ANNEX E

*Stroock & Stroock & Lavan*

*1801 Century Park East*

*Los Angeles, California 90067*

OF COUNSEL
WILLIAM H LEVIT
(PROFESSIONAL CORPORATION)

———

MEMBERS OF
THE FIRM
ADMITTED
IN CALIFORNIA

CARL I KANTER
RONALD L KATSKY
HENRY J SILBERBERG
MICHAEL M. UMANSKY

TELEPHONE (213) 556-2100
TELEX 677190
CABLE-PLASTROOCK LOS ANGELES
TELECOPIER (213) 556-1366

NEW YORK, NEW YORK 10
61 BROADWAY
TELEPHONE (212) 425 5
WUI TELEX 620367
DOMESTIC TELEX 767
TELECOPIER (212) 425 2
———
WASHINGTON, D C 200
1150 SEVENTEENTH STREE
TELEPHONE (202) 452 9
TELEX 89401
TELECOPIER (202) 293 4
———
MIAMI, FLORIDA 33 4
1666 KENNEDY CAUSE
TELEPHONE (305) 865 4
TELECOPIER (305) 868-

September 24, 1979

EXPRESS MAIL

Honorable John T. Racanelli
Presiding Justice
Court of Appeal
First Appellate District, Division One
4154 State Building
San Francisco, California 94101

> Re: Olson v. Cory
> No. LA 31142
> Sacramento Calendar
> October 3, 1979

Dear Justice Racanelli:

I am counsel for plaintiffs and respondents in the above case. I have this date been informed by the Clerk's office that on September 21, 1979 an order was made by Manuel, Acting Chief Justice assigning you to sit as a Justice Pro Tempore of the Supreme Court on the above case.

On July 20, 1979 I addressed a letter to the Chief Justice and Justice Tobriner requesting that they disqualify themselves from participating in this case on the grounds of possible bias and prejudice for the reasons set forth in said letter. For your information, a copy of said letter with its enclosures is enclosed herewith.

Subsequently, I was advised by the Clerk's office of the Supreme Court that the Chief Justice and Justice Tobriner had disqualified themselves from participating in this case.

-1-

More

ANNEX E (cont'd.)

Honorable John T. Racanelli
September 24, 1979
-2-

I have just been informed that on or about July 27, 1978, seven Justices of the Court of Appeal, First Appellate District, of whom you were one, publicly announced that pursuant to the suggestion of the Chief Justice and Justice Tobriner (see copy enclosed), they had agreed to forego their salary increases. I am further advised that a story with respect thereto appeared in the July 27, 1978 edition of the San Francisco Chronicle (page 8).

It is respectfully submitted that the above circumstances suggest the appearance of possible bias and prejudice on your part with respect to the basic issues involved in this case, and that you should disqualify yourself.

We felt it appropriate to make this request in the form of this letter. Should you decide that in order for this request to be considered by you a formal statement must be filed with the Court pursuant to section 170, subdivision 5 of the Code of Civil Procedure, your immediate advices will be appreciated, so that we may consider whether such a proceeding should be instituted. Also, should it appear that the information I have received is materially incorrect, your advices with respect thereto will be helpful.

Sincerely,

STROOCK & STROOCK & LAVAN
GIBSON, DUNN & CRUTCHER

By _William H. Levit_
 William H. Levit

Attorneys for Plaintiffs
and Respondents

WHL/sc

cc: Honorable Wiley W. Manuel,
 Acting Chief Justice
 Jerome B. Falk, Jr., Esq.

 (Via Express Mail)

· ANNEX F

*Stroock & Stroock & Lavan*

*1801 Century Park East*

*Los Angeles, California 90067*

OF COUNSEL
WILLIAM H LEVIT
PROFESSIONAL CORPORATION

MEMBERS OF
THE FIRM
ADMITTED
IN CALIFORNIA

CARL I KANTER
RONALD L KATSKY
HENRY J SILBERBERG
MICHAEL M UMANSKY

TELEPHONE (213) 556-2100
TELEX 677190
CABLE-PLASTROOCK LOS ANGELES
TELECOPIER (213) 556-1366

NEW YORK, NEW YORK 10006
61 BROADWAY
TELEPHONE (212) 425 5200
WUI TELEX 620367
DOMESTIC TELEX 126754
TELECOPIER (212) 425-2175
WASHINGTON, D.C 20036
1150 SEVENTEENTH STREET N
TELEPHONE (202) 452-9250
TELEX 89401
TELECOPIER (202) 293-2293
MIAMI, FLORIDA 33141
1666 KENNEDY CAUSEWAY
TELEPHONE (305) 865-5010
TELECOPIER (305) 868 0347

September 26, 1979

EXPRESS MAIL

Honorable George A. Brown
Presiding Justice
Court of Appeal
Fifth Appellate District
State Building, Room 5077
Fresno, California 93721

> Re: Olson v. Cory
> No. LA 31142
> Sacramento Calendar
> October 3, 1979

Dear Justice Brown:

There is enclosed a copy of a letter and enclosures which I sent to Justice Racanelli under date of September 24, 1979.

I have now been informed that in or about July or August, 1978 you announced that you would forego your salary increase, and apparently have done so since that time.

For the same reasons set forth in the letter to Justice Racanelli, it is respectfully requested that you disqualify yourself in this case.

-1-

More

ANNEX F (cont'd.)

Honorable George A. Brown
September 26, 1979
-2-

 Should it appear that the information I have received
is materially incorrect, your advices with respect thereto
will be appreciated.

 Sincerely,

 STROOCK & STROOCK & LAVAN
 GIBSON, DUNN & CRUTCHER

 By _____
 William H. Levit

 Attorneys for Plaintiffs
 and Respondents

WHL/sc

cc: Honorable Wiley W. Manuel
 Acting Chief Justice
 (Delivered by Messenger)

 Jerome B. Falk, Jr., Esq.
 (Via Express Mail)

Enclosure

ANNEX G

## Stroock & Stroock & Lavan

### 1801 Century Park East
### Los Angeles, California 90067

OF COUNSEL
WILLIAM H. LEVIT
(PROFESSIONAL CORPORATION)
- --- ---

MEMBERS OF
THE FIRM
ADMITTED
IN CALIFORNIA

CARL I. KANTER
RONALD L KATSKY
HENRY J. SILBERBERG
MICHAEL M. UMANSKY

TELEPHONE (213) 556-2100
TELEX 677190
CABLE-PLASTROOCK LOS ANGELES
TELECOPIER (213) 556-1366

NEW YORK, NEW YORK 10C
61 BROADWAY
TELEPHONE (212) 425 52!
WUI TELEX 62030 /
DOMESTIC TELEX 12075
TELECOPIER (212) 425 7!
WASHINGTON, D C, 2003
1150 SEVENTEENTH STREET
TELEPHONE (202) 457 92
TELEX 89401
TELECOPIER (202) 293 22
MIAMI, FLORIDA 33141
1666 KENNEDY CAUSEW
TELEPHONE (305) 865 9!
TELLCOPIER (305) 868 0

September 26, 1979

DELIVERED BY
MESSENGER

Honorable Wiley W. Manuel
Acting Chief Justice
Supreme Court of California
4250 State Building
455 Golden Gate Avenue
San Francisco, California 94102

 Re: Olson v. Cory
 No. LA 31142
 Sacramento Calendar
 October 3, 1979

Dear Justice Manuel:

 There is enclosed a photocopy of what appears to be
a letter opinion written by you to the Attorney General
on January 7, 1976 with respect to the constitutionality
of Senate Bill 1276 in light of Article III, section 4 of
the California Constitution.

 Senate Bill 1276 provided for the total repeal of
Sec. 62803 of the Government Code, whereas the 1976 amend-
ment to section 62803 which was enacted at the same session,
the constitutionality of which is involved in the case at
bench, provided for only a 22-month freeze and thereafter a
5% ceiling. It is apparent that the constitutional issues
involved in the case at bench are identical to those dis-
cussed in the enclosed opinion.

-1-

More

ANNEX G (cont'd.)

Honorable Wiley W. Manuel
September 26, 1979
-2-

 It occurred to us that you may have forgotten you had written this opinion, so we felt we should call it to your attention.

 We do not contend that the writing of this opinion would disqualify you from sitting on this case under section 170 of the Code of Civil Procedure. However, you may want to consider whether it is appropriate for you to sit on this case, which is of considerable public importance, where you have previously expressed firm opinions on two of the basic issues involved.

 Sincerely,

 STROOCK & STROOCK & LAVAN
 GIBSON, DUNN & CRUTCHER

 By _William H. Levit_ (per HJS)
 William H. Levit

 Attorneys for Plaintiffs
 and Respondents

cc: Jerome B. Falk, Jr., Esq.
 (Via Express Mail)

Enclosure

More

Department of Just

# .iemorandum

> : Attorney General Younger
 Los Angeles

Date : January 7, 1976

File No.:

rom : Office of the Attorney General

ubject: Senate Bill 1276 (Bielenson)

You have been asked whether in light of Article III, section 4 of the California Constitution, the repeal of section 68203 of the Government Code would be constitutional.

Senate Bill 1276 would eliminate the cost of living increases but would by amendment to section 68202 set the salaries of judges and justices at the level set as of September 1, 1975 under section 68203 as it now reads. Hence the "practical sidelight" mentioned by the requester of your views envisioning different salaries for the various incumbents will not arise and no invalid reduction in salary would occur if the bill in its existing form is enacted.

If section 68203 were simply repealed, this would take away the cost of living increases. This would leave the salaries set by Government Code section 68202 as the only statutory amounts to be paid. A literal application of section 68202 would then result in a salary reduction (assuming no amendment to section 68202). However, the constitutional provision would undoubtedly prevent a salary reduction of any of the judges covered by section 68203 during the term existing during the life of section 68203. The result is the "practical sidelight" noted in the request, i.e. different salaries depending upon the occurrence of the term of office. However, over time this difference would disappear and all judges would get the salary set by section 68202. This is because the constitutional provision would not bar a reduction in salary for those terms commencing after the repeal of section 68203.

Wiley W. Manuel
Chief Assistant Attorney General

WWM:ejl

cc: C. Barrett

[Mar. 1980]

## ANNEX H

[As reported in the Metropolitan News of August 14, 1978, the Chief Justice spoke these words at the opening of the Proposition 13 argument on August 11, 1978.]

"Before proceeding with the cases set for hearing this morning, I would like to address the motion which was lodged by the Kern County counsel asking for the recusal of the four members of this court who face a confirmation election in November.

"I can appreciate and understand why the request was filed. Prop. 13 has been the focus of public attention for some time. Many have spoken out on this court's role in considering the legal issues raised in relation to Prop. 13.

"Open discussion of issues of public importance is certainly to be encouraged in our democracy. However, the justices of this court have also been threatened with recall, with defeat at the polls, and even with an anonymous threat of physical violence to themselves and their families if they fail to vote in a particular way on these cases.

"Those who threaten fail to recognize the proper role of a judge of this court when deciding issues that come before it. Each of us who sit on this court has taken an oath of office. That oath does not ask us to make popular decisions, to act as barometers of public opinion, or to serve as interpreters of the Gallup Poll.

"Rather, the oath demands that we have the courage to follow the law, obey our consciences as judicial officers, and uphold the constitution of this state and nation.

More

ANNEX H (cont'd.)

"Justice Story said it well in his concurring opinion in Dartmouth College case in 1819:

'It is not for judges to listen to the voice of persuasive eloquence or popular appeal. We have nothing to do but to pronounce the law as we find it; and having done this, our justification must be left to the impartial judgments of our country.'

"The members of this court have been called upon time and time again to make tremendously difficult decisions.

In all those decisions, we have been guided by one principle: upholding the rule of law.

"It is only the integrity of the members of this state's judiciary which stands between a society governed by the rule of law and a society where that order has broken down.

"If our decisions in individual cases cost us dearly, it would be a small price to pay for the preservation of our democratic system. All the threats in the world will not deter us from the important task before us.

"The justices of this court intend to uphold their oaths and give these cases the impartial scrutiny they would any other matter that comes before the court.

"The motion to recuse is denied."

**ANNEX J**

SUPREME COURT
F I L E D
SEP 19 1979
G. E. BISHEL, Clerk.

Deputy

No.

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

# IN BANK

L.A. 31140 – MOSK v. SUPERIOR COURT, COUNTY OF LOS ANGELES

L.A. 31134 – COMMISSION ON JUDICIAL PERFORMANCE v. COURT OF
APPEAL, SECOND APPELLATE DISTRICT

This court determines Justice Newman to be disqualified in these proceedings.

_____, J.

_____, J.

_____, J.

_____, J.

I dissent for reasons to be filed later.

_____, J.

[Justice Miller dissented in
a separate opinion filed on
September 19, 1979.]

**598**

ANNEX K

I dissent.

The Commission on Judicial Performance has given no legal authority for the disqualification of Justice Newman.

Section 170(1) of the Code of Civil Procedure, providing that "No justice or judge shall sit or act as such in any action or proceeding: 1. To which he is a party; or in which he is interested . . ." is clearly inapplicable to Justice Newman. Despite the Commission's statements to the contrary, it is obvious that Justice Newman is neither a party nor a litigant in LA 31134 and LA 31140, the subject action to be reviewed by this tribunal.

Nor does Justice Newman have an "interest." While it is true that "the outcome of these actions will directly, immediately, and predictably determine whether Justice Mosk will be compelled to give public testimony relating to Justice Newman's role, if any, in the alleged improprieties under investigation in C.J.P. 3012," this does not mean that Justice Newman has any interest in whether the Commission hearing is public or private. Whether the testimony is taken in private or in public should not affect the Commission's decision.

"Supreme Court Justices disqualify when they have a dollar interest; when they are related to a party and, more recently, when they are related to counsel; and when the particular matter was in one of their former law offices during their association; or, when in the government, they dealt with the precise matter and particularly with the precise case; otherwise, generally, no."

-1- More

ANNEX K (cont'd.)

(Frank, Disqualification of Judges: In Support of the Bayh Bill, 35 Law and Contemporary Problems, 43, 50 (1970).) Absent one of the above "interests" there is no interest which is applicable to section 170(1).

Unlike the circumstances in Meyer v. City of San Diego (1898) 121 Cal. 102, cited by the Commission, there is no pecuniary interest involved here. The most that can be said is that Justice Newman has an intellectual interest in the outcome of this action.

Section 170(4), precluding a justice or judge from sitting when he has been attorney or counsel for any party, or when he has given advice to any party upon any matter involved in the action or proceeding, is likewise inapplicable to the present case. The most that can be said of Justice Newman's status in C.J.P. 3012 is that he is a witness.

Finally, section 170(5) does not apply. "There can be no disqualification of a judge for bias to pass on questions of law alone." (Calhoun v. Superior Court (1958) 51 Cal.2d 257, 260.) Thus, any opinions Justice Newman may have, or may have expressed on the law, do not disqualify him from future proceedings involving that precise question of law. (See, Laird v. Tatum (1972) 409 U.S. 824; Kreling v. Superior Court (1944) 25 Cal.2d 305, 310-311.)

Bias and prejudice necessary to disqualify a judge "are never implied and must be established by clear averments." (Shakin v. Board of Medical Examiners (1967) 254 Cal.App.2d 102,

More

ANNEX K (cont'd.)

117.) Since the Commission has presented no pertinent legal basis for the disqualification of Justice Newman, he should not be disqualified.

<u>Miller, J.</u>

## ANNEX L

### IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| COMMISSION ON JUDICIAL PERFORMANCE,<br><br> Petitioner,<br><br> v.<br><br>COURT OF APPEAL OF THE STATE OF CALIFORNIA, SECOND APPELLATE DISTRICT,<br><br> Respondent. | SUPREME COURT<br>**FILED**<br>SEP 20 1979<br>G. E. BISHEL, Clerk<br>———————— Deputy |

STANLEY MOSK,

 Real Party In Interest.

 Nos. LA 31134

 LA 31140

STANLEY MOSK,

 Petitioner,

 v.

THE SUPERIOR COURT OF LOS ANGELES COUNTY,

 Respondent.

 DISSENTING OPINION

 BY HOPPER, J.

COMMISSION ON JUDICIAL PERFORMANCE,

 Real Party In Interest.

I respectfully dissent.

Considering all of the circumstances Justice Newman should disqualify himself so that the court may maintain the appearance of impartiality and to avoid any suspicion of unfairness.

More

ANNEX L (cónt'd.)

Justice Miller has appropriately set forth the reason for the inapplicability of Code of Civil Procedure Section 170, subdivisions 1, 4 and 5, and I generally concur with his dissent.

In addition, I would emphasize that no constitutional provision, statute or officially published opinion of any California court has been called to our attention which procedurally gives the majority of the members of this court the power to disqualify one or more of the remaining members of this court. Such a procedure would be fraught with danger. The very thought of such an awesome power is frightening.

Could a majority of the court exercise such a power to disqualify a member for purely philosophic or political differences on some theory of prejudice? I think not. (I do not suggest in any way that such an exercise of raw power took place in the instant case. It did not.) Such a power simply cannot exist in a judiciary in a democratic society.

The legislature without violating the separation of powers doctrine can adopt reasonable regulations to apply to disqualification of judges. Such regulations need not list all of the factors which might cause a judge to be prejudiced. However, under the present legislation the legislature in this state wisely gave the power of disqualification to an individual judge, not to the majority of the members of the same court from which the challenged

ANNEX L (cont'd.)

judge came.

So long as Justice Newman is a duly elected member of this court he is entitled to remain so unless disqualified to sit, according to the law, or unless he recuses himself as urged herein.

_Hopper_
HOPPER, J.

3.

## ANNEX M (cont'd.)

LAW OFFICES

### MITCHELL, SILBERBERG & KNUPP

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

1800 CENTURY PARK EAST

LOS ANGELES, CALIFORNIA 90067

(213) 553-5000

CABLE ADDRESS.

SILMITCH

TELEX. 69-1347

ARTHUR GROMAN●
CHESTER I LAPPEN●
EDWARD RUBIN●
IRVING . AXELRAD●
WILBERT P ZARKY
HAROLD FRIEDMAN●
JAMES BOYD JENNINGS●
HOWARD S SMITH
EDWARD R McHALE●
SHERWIN L SAMUELS
ABRAHAM SOMER●
HARRY J KEATON
GORDON STULBERG
ALLAN E BIBLIN
HENRY L STERN
WILLIAM M KAPLAN
RICHARD W MOSK
CHARLES A COLLIER JR
FLOYD A RAPPAPORT
EDMUND A HAMBURGER
NICHOLAS COUNTER III
EDWARD M MEDVENE
MICHAEL HOLTZMAN
MARC MAYSTIN
KENNETH A KLEINBERG
JOSHUA J KUPIETZKY
RICHARD I LEHER
HOWARD J RUBINROIT
RUSSELL J FRACKMAN
H WAYNE TAYLOR
THOMAS P LAMBERT
EUGENE H VEENHUIS
STUART LINNICA
ALBERT I PRAW
STEPHEN L SHULTS

JUDITH N LEVY
STEVEN M SCHNEIDER
RANDOLPH M BLOTKY
DAVID S SAUNDERS
PATRICIA H BENSON
PETER M LOPEZ
HAYWARD J KAISER
MARILYN E LEVINE
DAVID S GUBMAN
MILTON E OLIN JR
DEBORAH P KOEFFLER
PHILIP DAVIS
DAVID HOCHMSON
NORMAN A BEIL
JOHN M RUECHLE
WILLIAM L COLE
RICHARD S HESSEKHUS
MELINDA M BENEDEK
BRUCE LILLISTON
EMILY J SHENKIN
DENNIS J RIDER
DAVID P LAMPKIN
MICHAEL J ELIASBERG
J THOMAS OLDHAM
RICHARD W POE
CHARLES F EICK
STAFFORD S MATTHEWS
ROBERT N BLOCK
JOSEPH CIASULLI
ROBIN HAMILL
STEVEN MORGAN
WENDY CARSON
KENNETH H LEVIN
RICHARD FINKELSTEIN

●A PROFESSIONAL CORPORATION

H B SILBERBERG 1908 I6
GUY KNUPP 1907-197C

OF COUNSEL
SHEPARD MITCHELL
HERBERT FRESTON
SEYMOUR P STEINBERG
RALPH E LEWIS
DANIEL A WEBER
JAMES D DEVINE

August 2, 1979

WRITER'S DIRECT NUMB

(213) 556-430:

OUR FILE NUMB

Hon. Frank Newman,
 Acting Chief Justice
 and Pro Tem Justices
State Supreme Court
State Building
San Francisco, California 94102

SUPREME COURT
F I L E D

G. E. BISHOL, Clerk

Deputy

> Re: Commission on Judicial
> Performance v. Court of
> Appeal
> No. L.A. 31134

Dear Justices:

In response to a question from the Supreme Court, the Commission under date of July 25, 1979, urged the Supreme Court Justices to disqualify themselves because they were "interested" in the outcome and because they must avoid "the appearance of impropriety" (Canon 2, Cal. Code of Judicial Conduct).

In presenting the issue originally to the Trial Court in Los Angeles, we recall that Commission counsel did not disagree with our view that no member of the Judicial Council at the time Rule 902.5 was promulgated should hear this litigation.

In view of the Commission's previous declarations, we are confident that in the spirit of objectivity and fairness in appearance the Commission would agree with us that a Justice, who, as a member of the Judicial Council, argued and voted for the enactment of Rule 902.5, should not serve as a member of this pro tem Supreme Court.

More

## ANNEX M

Hon. Frank Newman,
 Acting Chief Justice
 and Pro Tem Justices
August 2, 1979
Page Two

 In addition, Justice Jefferson is a directly
interested party in other litigation--the case of Brown
v. Curb--now pending before the Supreme Court on which
Justice Mosk sits.

 Therefore, with utmost respect for Justice
Jefferson as a distinguished jurist, under these cir-
cumstances we request that he recuse himself from the
impossible task of passing upon the constitutionality
of the rule which he previously urged and supported.
If he sat on this case he would be reviewing his own
judgment and decision.

 If Justice Jefferson declines to recuse
himself, we hereby move that this pro tem Court declare
him to be disqualified under Code of Civil Procedure,
Section 170(5).

 Respectfully submitted,

 MITCHELL, SILBERBERG & KNUPP
 EDWARD M. MEDVENE
 RICHARD M. MOSK

 By Edward M Medvene
 Edward M. Medvene
 Attorneys for
 Real Party in Interest

cc: Seth M. Hufstedler
 Justice Roth

I. J. KAVANAGH
CHIEF DEPUTY

DEPUTIES
ENZO C. MATTIOLI
G. E. CONKLINER
JEAN C. RUSSI
FLORENCE LUPO
SAN FRANCISCO

ROBERT F. JOHNSON
J. D. CROW
LOS ANGELES

OFFICES
SAN FRANCISCO 94102
4250 STATE BUILDING

LOS ANGELES 90010
3580 WILSHIRE BLVD

SACRAMENTO 95814
100 LIBRARY AND COURTS BLDG

OFFICE OF THE CLERK

## Supreme Court of California

SAN FRANCISCO, CALIFORNIA

G. E. BISHLL, CLERK

415—557-0587

August 10, 1979

Honorable Armand Arabian
Judge of the Superior Court
County of Los Angeles
6230 Sylmar Avenue
Van Nuys, California 91401

Re: S.F. 24021 - Brown et al. v. Curb et al.

Dear Judge Arabian:

In response to your letter of August 7, 1979, Justice Tobriner has requested that I forward to you the following reply:

"Traditionally, the fact that a party or an attorney of record in a case before this court has served, some time in the past, as a law clerk for one of the justices of the court, has not been considered a ground warranting the disqualification or recusal of a justice of this court. To my knowledge, the great majority of courts throughout this country follow a similar practice. (See generally Frank, Disqualification of Judges (1947) 56 Yale L.J. 605, 621.)

"In this case, recusal would appear particularly unwarranted in that the former law clerk appears here, not in a personal, but only official, capacity, and, further, that he completed his service with the court more than 14 years ago. (Cf., e.g., Rule 7, Rules of the Supreme Court of the United States ("No one serving as a law clerk or secretary to a justice of this court . . . shall . . . after separating from that position practice as an attorney or counsellor in this court until two years have elapsed after separation . . .").)

More

ANNEX N (cont'd.)

Honorable Armand Arabian
Page Two
August 10, 1979

"Accordingly, I have concluded that I should continue to participate in this matter."

Very truly yours,

J. L. Kavanagh
Chief Deputy

JLK:ms

cc: All Justices of the Supreme Court
 All Parties of Record
 Rec.
 Cal.

## ANNEX O

COMMENTARIES ON DISQUALIFICATION LAW

Generally see Arnold, California Courts and Judges Handbook (3d ed. 1979) p. 30; Prosecutorial and Judicial Misconduct (Cont.Ed.Bar 1979) sections 2.25-2.28, pages 93-100; 1 Witkin, Cal. Proc. (1970) p. 337. For a carefully prepared bibliography see <u>Disqualification of Judges for Prejudice or Bias -- Common Law Evolution, Current Status, and The Oregon Experience</u> (1969) 48 Ore.L.Rev. 311, 407; cf. Thode, <u>The Code of Judicial Conduct -- The First Five Years in the Courts</u> (1977) Utah L.Rev. 395, 416-422 (list of cases).

See too Davis, Administrative Law Treatise (1958) Chap. 12 (and also his supplements); Keeffe, <u>They're holding the party without Pertschuk</u> (1979) 65 ABA J. 1407; Note, <u>Disqualification of Federal Judges for Bias or Prejudice</u> (1978) 46 Chi.L.Rev. 236 (many other references cited).

## ANNEX P

ROBERT M BARTON
HAROLD S VOEGELIN
ROBERT H. KLUGMAN
RICHARD F OETTING
DAVID F MORGAN
WILLIAM D HERZ
CHARLES J SCHUFREIDER
ROBERT M. DAHLBO
ROGER A S MANLIN
ROBERT L. FISHER
GILBERT D. JENSEN
BARBARA W G CROWLEY
CYNTHIA GARRETT
DAVID J CARTANO
JEFFREY L MILLER
CRAIG C. ALEXANDER
JANICE L CELOTTI
DALE A HUDSON
WARREN A WILLIAMS

LAW OFFICES OF

### VOEGELIN & BARTON

606 SOUTH OLIVE STREET-EIGHTEENTH FLOOR

LOS ANGELES CALIFORNIA 90014

TELEPHONE 213-625-5731

July 9, 1979

CABLE VOBARISTER

ORANGE COUNTY OFFICE
4343 VON KARMAN AVENUE
NEWPORT BEACH CALIFORNIA 92660
TELEPHONE 714-752-7551

IN REPLY REFER TO

2-04255-011

Hon. Rose Elizabeth Bird,
 Chief Justice, and
 Associate Justices of the
 Supreme Court of California
350 McAllister Street
San Francisco, California 94102

Dear Chief Justice Bird and Associate Justices:

> Re: Rader v. Superior Court
> (Chodos and Tapper)
> 2d Civil No. 56571

I represent Hillel Chodos, the real party in interest in the above writ proceeding, which is now pending in this Court.

The writ proceeding arises out of a $26,000,000 suit for slander and intentional infliction of emotional distress filed by Stanley Rader in the Los Angeles Superior Court against Mr. Chodos and Lawrence R. Tapper. The suit, which was filed on March 5, 1979, claims to be based on statements to the news media allegedly made about him and his activities as a Church official by Messrs. Chodos and Tapper, when they were acting as counsel of record for the People of the State of California in the case of People v. Worldwide Church of God, Inc., Los Angeles Superior Court No. C 267,607.

Since the filing and service of the slander suit, I have been attempting to obtain all documents and records, including video and audio tapes, in the possession or under the control of Stanley Rader reflecting statements made by him of and concerning Mr. Chodos or the Worldwide Church of God so that the alleged defamatory statements may be viewed in the context in which they were made and to establish the various defenses of statutory and constitutional privilege which will be asserted on behalf of Mr. Chodos.

More

**610**

LAW OFFICES OF
VOEGELIN & BARTON

Hon. Rose Elizabeth Bird July 9, 1979
and Associate Justices of 2.
the Supreme Court

 After the failure of Mr. Rader to produce these
records and video tapes in spite of a court order to do so,
a further order of the Superior Court was entered on May 21,
1979 directing Mr. Rader to produce these records on June 29,
and to appear on July 9 for his deposition. Mr. Rader sought
a writ and a stay from the Court of Appeal for the Second
Appellate District on June 20, 1979. Rader's Petition was
denied by Division Four on June 22, 1979.

 On June 28, Mr. Rader filed a Petition for Hearing
and application for a stay in this Court. I prepared an
immediate response which I served and mailed to the Court for
filing on June 29 in the hope that it would reach the Court
before any action was taken on Mr. Rader's petition. As
matters turned out, it appears that a stay order was issued by
Justice Tobriner as Acting Chief Justice on June 29, before
my response had arrived. A copy of Justice Tobriner's order
is attached.

 Mr. Chodos is a member of the Commission on Judicial
Performance and has been engaged full time since June 18 in
the Commission's hearing which is currently in progress in
San Francisco. I did not have an opportunity to discuss Mr.
Rader's Petition for Hearing with Mr. Chodos before filing
and serving my response and it was not until late last week
that Mr. Chodos and I were able to discuss the matter.

 Mr. Chodos' law practice consists almost entirely
of complex trial and appellate litigation. Many of the matters
which he handles find their way to this Court in the ordinary
course of his professional activities. However, ever since the
possibility arose last November that the Commission might be
conducting an investigation into allegations against one or
more members of the Supreme Court, Mr. Chodos has endeavored
to avoid any possible situation which might be construed as
creating any impropriety or appearance of impropriety, either
for the Court or for himself as a member of the Commission.
Wherever the matter lay within his control, he has refrained
from filing any papers or initiating proceedings before this
Court in matters he is handling. In two instances, where the
interests of long-standing clients required that proceedings
go forward, he has withdrawn as counsel so that the client's
contentions could be determined without exposing the Court or
the Commission to any suggestion that the Court's decision
might have been influenced in some way by his involvement in
the case and his concurrent membership on the Commission.

 More

LAW OFFICES OF

VOEGELIN & BARTON

Hon. Rose Elizabeth Bird July 9, 1979
and Associate Justices of 3.
the Supreme Court

 In the present case, of course, Mr. Rader has made
Mr. Chodos a defendant in the underlying action, and a real
party in interest in the pending writ proceeding. Mr. Chodos
has had no control over the situation and, obviously cannot
withdraw as he has done when he was only counsel for one of
the parties.

 We recognize that this Court normally has both the
ultimate power, and the ultimate responsibility, to determine
legal questions of the kind presented in civil litigation
generally, and in the Rader petition in particular. We also
recognize that any litigant has the right to the full gamut
of appellate review of any legal contention, and cannot be
deprived of it merely because of the circumstance that the
Commission's investigation is presently in progress, and that
an opposing party happens to be a member.

 On the other hand, I respectfully suggest that if
the Court proceeds to pass on the merits of the Rader petition,
there is a genuine risk that its decision -- whichever way
it is made -- may be misinterpreted as having been made in
the light of the Commission hearings which are in progress at
this moment. Such a suggestion could only cause embarrassment
for the Court and the Commission.

 I do not propose to elaborate at length on the poten-
tial for misinterpretation. I should point out, however, that
according to my understanding, Mr. Chodos has been an active
participant in the hearings, having been described in the news-
papers as "perhaps the Commission's most persistent questioner."
On the other hand, Mr. Rader is seeking an enormous amount of
damages from him in the underlying suit; and indeed, the costs
of his defense since March have already run into five figures.
It might be difficult to convince a cynical observer that Mr.
Chodos' judgment as a member of the Commission could not be
affected by a decision (whether adverse or favorable) in that
case; and it might also be difficult to convince such an obser-
ver that the members of this Court did not have such consid-
erations in mind when making their decision. I do not suggest
that the decision of this Court or Mr. Chodos would in any way
be affected by such considerations. My only concern is as to
the potential questions which might be raised in this regard.

 Under all the circumstances, I respectfully request
that the Court consider selecting a panel of seven justices

More

**612**

LAW OFFICES OF
**VOEGELIN & BARTON**

Hon. Rose Elizabeth Bird July 9, 1979
and Associate Justices of 4.
the Supreme Court

pro tempore to pass upon the merits of the Rader petition
and any other matter that may arise in which Mr. Chodos
is a party or otherwise inextricably involved. The members
of such a panel could be designated by appointment, or per-
haps even chosen by lot. The papers could, of course, be
distributed by mail; and if the panel should have to con-
vene at any time for oral argument, I would be happy to
travel to any place in California where it is most conven-
ient and least expensive to the State for them to do so.

 Respectfully submitted,

 Richard F. Oetting

RFO:bj

cc: Ervin, Cohen & Jessup

 Ms. Elizabeth A. Koen

 Hon. Thomas T. Johnson

 Clerk, Court of Appeal, 2d
 Appellate District, Div. Four

 Hillel Chodos, Esq.

 Hon. Bertram D. Janes, Chairman
 Commission on Judicial Performance

 Seth M. Hufstedler, Esq.

## ANNEX Q

JOHN W. ERVIN
LEONARD COHEN
W. EDGAR JESSUP, JR.
MELVIN S. SPEARS
BERTRAM K. MASSING
HORACE N. FREEDMAN
MARVIN H. LEWIS
ALLAN BROWNE
LYN B. EHRNSTEIN
ARTHUR FIELDS
GREGORY E. KIRKELIE
EDWARD A. WOODS
DANIEL H. LIDMAN
ALLAN B. COOPER
GEORGE F. SCHIAVELLI
JAMES D. C. BARRALL
DAVID R. CANDI
GARY O. MICHEL
ALLAN GABRIEL
GREGORY M. MacGREGOR
M. JASON ZELIN
GERALD M. YAROSLOW
CLIFFORD H. BROWN
DAVID M. ALPER
MARCY J. SOBEL
ANTHONY A. ADLER.

LAW OFFICES

# ERVIN, COHEN & JESSUP

NINTH FLOOR

9401 WILSHIRE BOULEVARD

BEVERLY HILLS, CALIFORNIA 90212

July 10, 1979

TELEPHONES
(213) 272-7833
(213) 273-6333

CABLE: JOLED
TWX: 910-490-5748

REF. OUR FILE NO

**RECEIVED**

JUL 11 1979

OFFICE OF THE CLERK
SUPREME COURT

Hon. Rose Elizabeth Bird, Chief Justice
 and Associate Justices of the
 Supreme Court of California
350 McAllister Street
San Francisco, California 94102

> Re: Rader v. Superior Court
> (Chodos v. Tapper)
> 2d Civil No. 56571

Dear Chief Justice Bird and Associate Justices:

In response to Mr. Oetting's letter of July 9, 1979 requesting that this Court disqualify itself en banc because of Mr. Chodos' membership on the Commission on Judicial Performance, we reply as follows:

a. We believe any suggestion that the Court could not rule fairly on the pending matter is absurd.

b. Petitioner is entitled to have this case heard by the members of this Court performing their constitutional duty - not by a court of seven pro-tem surrogates.

c. If Mr. Chodos' membership on the Commission on Judicial Performance raises a conflict, the obvious answer is for Mr. Chodos to resign from the Commission or withdraw from the present Commission hearing.

Respectfully,

Allan Browne

AB/mc